No. 2--03--1383

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

CARLA LAROCHELLE, RON HOLZER, WILLIAM WHEELER and LINDA PENN, a Marital Community, ALLEN WEISS, PETER OLMSTEAD, EVELYN ROBERTS, STEVEN SWENSON, MARY JO LAMB, HELEN MEHOUDAR, EDLUND REAL ESTATE, a Michigan Company, SARIBA INTERNATIONAL, LTD., a California Company, SABA LTD., a California Company, JAMES KNOLL, STANTON SMITH, JACK COURSHON, GABALDON FAMILY LTD, a New Mexico Limited Partnership, JAMES HASTINGS, GEORGIAN.COM, LP, a Nevada Limited Partnership, NORMAN and MARY ABRAMS, PETER GOLLON, GOLLON FAMILY LTD., a New York Limited Partnership, BERNARD PEYTON, ROBERT and PATRICIA RALPH, S AND R INVESTMENTS, MARCIE POLIER FAMILY FOUNDATION, MARCIE POLIER LIVING TRUST, PAT CLEMENTE, RONALD LANGE, and NANCY O'CONNER,

Plaintiffs-Appellants,

v.

MARTIN ALLAMIAN, JAMES J. MANNING, ROBERT PASZKIET, MARTIN JAMES CAPITAL MANAGEMENTS, INC., M.J. SELECT 

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the Circuit Court

of Kane County.

No. 02--L--380

GLOBAL, LTD., COMMODITY COMPLIANCE SERVICES, INC., MICHAEL COGLIANESE, GINA COGLIANESE, VORISEK AND COMPANY, LLC, TERAH RAHMING, KENNETH CLOWES, and OCEANIC BANK AND TRUST COMPANY, LTD.,

Defendants-Appellees.

)

)

)

)

)

)

)

)

)

Honorable

F. Keith Brown,

Judge, Presiding.

______________________________________________________________________________

JUSTICE McLAREN delivered the opinion of the court:

Plaintiffs appeal from the order of the trial court granting the motion to dismiss of defendant Oceanic Bank & Trust Company, Ltd.  We reverse and remand.

Plaintiffs are a group of 32 investors, three of whom are citizens of Illinois, owning common shares of defendant M.J. Select Global, Ltd., an investment company organized under the laws of the Bahamas.  In August 2002, plaintiffs brought a seven-count complaint against nine defendants, seeking declaratory relief and damages "arising from the wrongful offering, sale, accounting, and management of shares" in M.J. Select.  Oceanic, whose principal place of business is located in Nassau, Bahamas, was named as a defendant and was alleged to be "the administrator, registrar and transfer agent" of M.J. Select.

On October 7, 2002, Oceanic filed an appearance and a motion for extension of time and for leave to file an oversized brief "in support of its expected motion to dismiss for lack of personal jurisdiction and for failure to state a claim."  The following day, the court set the motion for hearing on October 21, when the case was "otherwise set for status."  The October 8 order also dealt with plaintiffs' motion regarding other defendants and those defendants' answers.  The trial court granted Oceanic's motion on October 21.  At that time, another law firm entered its appearance as additional counsel for Oceanic.

Oceanic subsequently filed a motion to dismiss pursuant to sections 2--615 and 2--619 of the Code of Civil Procedure (Code) (735 ILCS 5/2--615, 2--619 (West 2000)).  Oceanic was also granted leave to join in the motion to dismiss filed by defendant Vorisek & Co., LLC.  After a hearing, the trial court granted Oceanic's motion to dismiss pursuant to section 2--619 "due to lack of personal jurisdiction."  The trial court did not address Oceanic's section 2--615 arguments in its ruling.  The trial court denied plaintiffs' motion for reconsideration and subsequently found that there was no just reason for delaying appeal of this issue, pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)).  This appeal followed.

Plaintiffs now contend that the trial court erred in granting Oceanic's motion to dismiss.  A motion brought pursuant to section 2--619 admits the legal sufficiency of the complaint, along with all well-pleaded facts and the inferences therefrom, but asserts an affirmative matter that avoids or defeats the claim.  
Northwest Millwork Co. v. Komperda
, 338 Ill. App. 3d 997, 1000 (2003).  This court must ascertain whether a genuine issue of material fact precluded the dismissal or, if such an issue does not exist, whether the dismissal was proper as a matter of law.  
Northwest Millwork Co.
, 338 Ill. App. 3d at 1000.  We review 
de novo
 the trial court's ruling on such a motion
.  
Northwest Millwork Co.
, 338 Ill. App. 3d at 1000.

In its motion, Oceanic argued that it was not subject to personal jurisdiction in Illinois because of a "lack of contact with Illinois."  However, plaintiffs argue that Oceanic waived the issue of personal jurisdiction by filing a general appearance and participating in a status conference, which resulted in a substantive discovery order involving Oceanic, before it objected to personal jurisdiction by filing its section 2--619 motion.

Section 2--301(a) of the Code provides in part:

"Prior to the filing of any other pleading or motion other than a motion for an extension of time to answer or otherwise appear, a party may object to the court's jurisdiction over the party's person, either on the ground that the party is not amenable to process of a court of this State or on the ground of insufficiency of process or insufficiency of service of process, by filing a motion to dismiss the entire proceeding or any cause of action involved in the proceeding or by filing a motion to quash service of process."  735 ILCS 5/2--301(a) (West 2000).

Section 2--301(a--5) then provides:

"If the objecting party files a responsive pleading or a motion (other than a motion for extension of time to answer or otherwise appear) prior to the filing of a motion in compliance with subsection (a), that party waives all objections to the court's jurisdiction over the party's person."  735 ILCS 5/2--301(a--5) (West 2000).

Section 2--301, which was amended effective January 1, 2000, had previously stated that a defendant had to file a special appearance for the purpose of objecting to the court's jurisdiction over his person; this special appearance had to be filed prior to the filing of any other pleading or motion, and every appearance not in compliance with that section was considered a general appearance.  See 735 ILCS 5/2--301(a) (West 1998).  Plaintiffs argue that, while the 2001 amendment did away with the requirement of a special appearance, the underlying principle was unchanged: a party must first object to jurisdiction before taking any other action.

We agree that a defendant's first action must be to object to jurisdiction.  This court has interpreted the amendment to section 2--301 to evince the legislature's intent "to permit a party to file a motion or other responsive pleading after the party objects to the court's jurisdiction over the party's person."  
In re Marriage of Schmitt
, 321 Ill. App. 3d 360, 366 (2001).  A party does not waive its objection to the court's jurisdiction over the party's person so long as the party objects to the court's jurisdiction before the party files a motion or other responsive pleading.  
Schmitt
, 321 Ill. App. 3d at 366.  Here, Oceanic's first pleading was a motion for an extension of time and page length regarding its "expected motion to dismiss for lack of personal jurisdiction and for failure to state a claim."  Since section 2--301 no longer requires the filing of a special appearance in such a situation (indeed, there is no longer any mention of a special appearance in the Code), we cannot conclude that the filing of a general appearance waives the issue of personal jurisdiction.  Oceanic had to file some type of appearance; attorneys cannot just walk into court and seek involvement in a case without one.  We do not find that Oceanic's general appearance, filed with its motion regarding an anticipated motion to dismiss for lack of jurisdiction, waived Oceanic's challenge to the trial court's personal jurisdiction.

Plaintiffs also argue that Oceanic submitted to the trial court's jurisdiction by appearing at and participating in the trial court's October 21, 2002, status call that resulted in a substantive discovery order against Oceanic.  According to plaintiffs, a substantive order could not have been entered against Oceanic unless it had submitted to the trial court's personal jurisdiction.  However, our review of the order entered after the October 21 court date is not so clear.  The portion of the order regarding discovery required "Defendants" to produce written discovery and deposition transcripts from related federal litigation.  Various other defendants were present in court that day, and the order does not specify which defendants were required to provide the discovery.  We do not know if Oceanic was even involved in the federal litigation.  Plaintiffs have not included a transcript of that day's proceedings in the record.  Without more, we cannot conclude that the October 21 discovery order applied to Oceanic, and we cannot find that Oceanic waived its objection to the court's personal jurisdiction.

It is undisputed that Oceanic is a foreign corporation not licensed in Illinois.  Under the "long-arm statute," section 2--209 of the Code (735 ILCS 5/2--209 (West 2000)), an Illinois court may exercise jurisdiction over such a corporation based upon (1) the fact that the corporation is "doing business" in Illinois (735 ILCS 5/2--209(b)(4) (West 2000)); or (2) compliance with one or more of the requirements of section 2--209(a) of the Code (735 ILCS 5/2--209(a) (West 2000)).  
Hendry v. Ornda Health Corp.
, 318 Ill. App. 3d 851, 853 (2000).  If jurisdiction is found to be proper on one of those grounds, we must then determine if the exercise of jurisdiction comports with due process of law.
(footnote: 1)  
Kalata v. Healy
, 312 Ill. App. 3d 761, 765 (2000).  
A plaintiff has the burden of establishing a 
prima facie
 basis for jurisdiction over a nonresident defendant.  
Kalata
, 312 Ill. App. 3d at 765.  Any conflicts between the parties' affidavits will be resolved in the plaintiff's favor for purposes of determining if a 
prima facie
 case for personal jurisdiction has been alleged.  
Kalata
, 312 Ill. App. 3d at 765.  Where the trial court's determination of jurisdiction is based solely on documentary evidence, our review is 
de novo
.  
Haubner v. Abercrombie & Kent International, Inc.
, 351 Ill. App. 3d 112, 117 (2004).

There is no fixed test for determining whether a foreign corporation is "doing business" in Illinois; a court must perform a case-by-case analysis to determine if a corporation is conducting business of such a character and extent as to warrant the inference that the corporation has subjected itself to the jurisdiction and laws of Illinois.  
Haubner
, 351 Ill. App. 3d at 119.  The corporation must transact business within Illinois not casually or occasionally, but with a fair measure of permanence and continuity.  
Haubner
, 351 Ill. App. 3d at 119.  This standard is quite high, but once satisfied, a corporation is considered a resident of Illinois and may be sued on any cause of action, whether or not it arose out of the corporation's contacts with the state.  
Haubner
, 351 Ill. App. 3d at 119.  Most Illinois courts finding personal 
jurisdiction
 over foreign corporations have based their determinations on facts such as whether the defendant has maintained offices or engaged in sales activities in Illinois.

Plaintiffs alleged that in 1995, Oceanic acquired a company known as New World Trustees, Ltd., and succeeded to an agreement between it and M.J. Select to be "the administrator, registrar and transfer agent of defendant M.J. Select," which was organized under the laws of the Bahamas.  While M.J. Select shares listed its place of business in Nassau, Bahamas, plaintiffs alleged that M.J. Select's principal place of business was actually in St. Charles, Illinois, at the same address as Martin James Capital (M.J. Capital), which is also a defendant and "controlled M.J. Select as the fund's officially appointed investment manager."  In its administration of M.J. Select, Oceanic engaged in numerous activities involving parties located in Illinois, including:  mailing notices and monthly and annual statements to shareholders; sending and receiving facsimile and e-mail transmissions and correspondence with shareholders; receiving funds from shareholders; sending and receiving wire transfers from shareholders' bank accounts; receiving redemption requests from, and confirming successful transmission of redemption funds to, M.J. Capital; maintaining its list of shareholders with M.J. Capital; and reviewing subscription agreements and processing subscriptions, redemptions, and transfers from investors.

Plaintiffs also included in the record transcripts of various depositions.  Richard Yasak, Jr., was an employee of defendant Commodity Compliance Services, Inc. (CCS), an Illinois corporation with its principal place of business in Bloomingdale, Illinois.  CCS provided accounting services to M.J. Select.  In the partial transcript of his deposition that is contained in the record, the following colloquy took place:

"A [Yasak]. Who did I report to?

Q. Or CCS.  Who did CCS report to at Oceanic?

A. We sent the stuff to Sharon.

Q. Okay.

A. I mean, they hired us to do accounting; so I don't know if we reported to anybody. 

* * *

Q. Who hired CCS to perform accounting for M.J. Select?

A. I don't know.  I assume either Oceanic or Marty [Allamian, president of M.J. Capital]."

Also included were partial transcripts of the deposition of defendant Michael Coglianese, who, according to the complaint, is "purported to be the principal and president" of CCS.  When asked who hired his firm to provide accounting services for M.J. Select, Coglianese replied, "I think it was Ocean--or New World Trust."  During questioning about the creation of daily fund valuations for M.J. Select by CCS, the following took place:

"Q. Would CCS do that at Marty Allamian's request?

A. His request or Oceanic's request.  
Oceanic was really the client
.

Q. Do you remember whether Marty ever specifically requested that CCS do daily fund valuations for M.J. Select?

A. I don't remember.

Q. You do remember someone from Oceanic requesting that?

A. It could have been.  I'm not sure who did.  
But the only time anything got done for the fund, if Oceanic requested it [sic]
."  (Emphasis added.)

Coglianese was asked if CCS had any responsibility for authorizing the transfer of money to or from M.J. Select trading accounts.  After explaining that, in such instances, CCS reviewed source documents to verify account numbers and amounts to be transferred, especially in cases of redemptions, Coglianese stated:

"So, I guess, if you want to call it authorization, you know, that's basically what--but there was no--ever any signatory powers, anything like that.  Oceanic was responsible for moving all monies, or New World Trust, I believe.

Q. New World Trust which later became Oceanic?

A. Yeah."

Coglianese explained that redemption sheets "would come over from Oceanic or from MJ's people.  Typically there was, like, one from each; so then they would compare it against each other to make sure all the redemption numbers matched."  If a discrepancy were found during the comparison, CCS would notify both and wait for a definitive answer on which amount was correct.  According to Coglianese:

"It was always Oceanic's call on the numbers that were being redeemed or additions, et cetera.
  We never took MJ's people's word for it."

When asked who at M.J. Capital had authority to initiate or stop redemptions from M.J. Select, the following was said:

"A. Nobody.

Q. Your understanding is that Oceanic had the full responsibility with respect to redemptions?

A. That was crystal clear.  I mean, they told me that over the phone many times.

Q. Who told you that over the phone?

A. Sharon Clare [an accountant at Oceanic]."

Coglianese was read a paragraph from a letter from Terah Rahming, Oceanic's manager of fund services, to M.J. Select shareholders, which stated as follows:

" 'The fund, MJ Select, retained the service was [
sic
] of Commodity Compliant Services to calculate the net asset value of the fund; and as such, they are responsible for the correctness of the net asset value calculation.' "

When Coglianese was asked if he agreed with that statement, the following colloquy took place:

"A. I believe that not the fund retained services of CCS but Oceanic or New World retained services of CCS to compile the initial computation of net asset value, which was then sent over to New World for review and then sent out to the partners.  That would be a correct statement.

Q. Is it correct that Oceanic retained the services of CCS to calculate the net asset value of the fund?

A. It's correct that Oceanic obtained the services of CCS to compile the monthly financial statements of the fund. 

* * *

Q. Did CCS receive funds from the administrator for calculating the net asset value of the fund?

A. I don't know.

Q. Do you know whether they were paid by Oceanic to calculate the net asset value of the fund?

A. I don't know.  You'd have to ask Gina that question.

Q. Presumably they wouldn't have done the work if they weren't paid, right?

A. They were paid by somebody.

Q. Oh, you don't know whether it was Oceanic or Martin James that paid CCS?

A. Correct."

Coglianese also stated that defendant Vorisek & Co., LLC, was hired to provide auditing services for M.J. Select.  Plaintiffs allege that Vorisek is a limited liability company organized under the laws of Illinois with its principal place of business in McHenry, Illinois.

Also included in the record is a partial transcript of the deposition of defendant Martin Allamian, taken from a related case in the United States District Court for the Northern District of Illinois.  Allamian was president of M.J. Capital.  Allamian testified that, while CCS provided accounting services for M.J. Select, including producing monthly statements, "Oceanic [was] really in charge of doing them.  I believe they use Coglianese to produce those statements, though."  Allamian also testified that a year-end audit of M.J. Select's asset valuation was performed; when asked if Oceanic arranged for that audit, Allamian stated, "I believe they did, yes."

 Most of plaintiffs' allegations involving Oceanic's sending and receiving of facsimiles, e-mails, wire transfers, and various other paperwork fall short of showing that Oceanic did business in Illinois.  In addition, we find that Oceanic's website does not indicate that Oceanic did business in Illinois.  The type of Internet activity sufficient to establish personal jurisdiction is a developing area of jurisprudence; however, courts have adopted a sliding scale analysis of Internet activity.  
Bombliss v. Cornelsen
, 355 Ill. App. 3d 1107, 1114 (2005).  At one end, jurisdiction does not attach where the nonresident maintains a passive website that merely provides information about the defendant's products or services.  
Bombliss
, 355 Ill. App. 3d at 1114.  At the other end, jurisdiction attaches to a nonresident defendant where it transacts business in foreign jurisdictions via an interactive website where contracts are completed online and the defendant derives profit directly from web-related activity.  
Bombliss
, 355 Ill. App. 3d at 1114.  In between lies a third type of website that is interactive in that it allows customers in foreign jurisdictions to communicate regarding the defendant's products and services; such a website may or may not be sufficient to assert personal jurisdiction, depending on the level of interactivity and the commercial nature of the information exchanged.  
Bombliss
, 355 Ill. App. 3d at 1114.

We conclude that the Oceanic website is barely more than passive, thus sliding into the last category, but falling well short of the level of interactivity necessary to find personal jurisdiction.  The only truly interactive aspect of the website is the "Market Watch" section, which shows the current quotes of the major stock market indices and apparently allows the user to find current quotes of specific stocks.  The site also provides a client information form to open an account with Oceanic.  However, this form apparently cannot be filled out online and directly sent electronically to Oceanic; additional documentation, including a recent copy of a utility bill, the first pages of a passport, and a copy of a driver's license must be attached, and various references are required before an account can be opened.  Oceanic's website does little more than provide information regarding its services and provide an application that can be printed out and sent to Oceanic.  While Oceanic's e-mail address is included, there is no interactivity.  Thus, we find no basis for jurisdiction because of the website.

However, the level of activity involving Oceanic, M.J. Select, CCS, and Vorisek leads us to conclude that plaintiffs made a 
prima facie
 showing that Oceanic did business in Illinois such that personal jurisdiction can be found.  First, plaintiffs alleged in their complaint that, while the offering documents for M.J. Select list its principal place of business as Nassau, Bahamas, M.J. Select's actual principal place of business is in St. Charles, Illinois.  Oceanic never directly denied this allegation.  Taking this allegation as true (see 
Northwest Millwork Co.
, 338 Ill. App. 3d at 1000), Oceanic had a contract to administer a corporation with its principal place of business in Illinois.

While the record does not contain a contract between Oceanic and CCS, the record does contain evidence that Oceanic hired CCS, an Illinois corporation, to perform various accounting services for, and on behalf of, Oceanic and M.J. Select.  Richard Yasak testified that he assumed that either Oceanic or Martin Allamian hired CCS to do the accounting for M.J. Select; however, he reported to "Sharon" at Oceanic.  Michael Coglianese testified that CCS created daily fund valuations of M.J. Select at the request of Oceanic or Allamian.  He called Oceanic "the client" and stated that "the only time anything got done for the fund, [was] if Oceanic requested it [
sic
]."  He also testified that it was Oceanic, or its predecessor New World Trust, that retained the services of CCS to compile the initial computation of net asset value and the monthly financial statements of the fund.  He was unsure only of whether payment for these services came from Oceanic or M.J. Capital.  Allamian testified that Oceanic arranged for Vorisek to provide auditing services for M.J. Select.

Merely entering into a contract with a resident of Illinois is not sufficient by itself to subject a nonresident to 
in personam
 jurisdiction in Illinois.  
Hendry
, 318 Ill. App. 3d at 854.  The business conducted by the nonresident must be carried on with a fair measure of permanence and continuity, not occasionally or casually.  
Hendry
, 318 Ill. App. 3d at 853.  Here, the evidence shows contacts with three Illinois companies and continual, intense business contact between Oceanic and M.J. Select and CCS.  Obviously, Oceanic had continuous contact with M.J. Select as its administrator.  Regarding CCS, Coglianese testified that Oceanic was intimately involved in authorizing transfers of all money in the fund and that Oceanic, not M.J. Capital, made decisions regarding discrepancies found by CCS:

"It was always Oceanic's call on the numbers that were being redeemed or additions, et cetera
.  We never took MJ's people's word for it."

Oceanic's full responsibility with respect to redemptions was made "crystal clear" by Sharon Clare of Oceanic "many times."  The very nature of CCS's responsibility as accountants is evidence of the permanency and continuity of the business relationship.  CCS was hired to compile monthly financial statements; this was not a one-time deal.  The record includes copies of facsimile transmissions from Oceanic to Coglianese at CCS, concerning account bank statements and activity covering a period of over three years.  The record here shows a continuous, intimate business relationship between Oceanic, M.J. Select, and CCS such that Oceanic can be said to be "doing business" in Illinois.

These contacts with Illinois are sufficient to comport with the federal due process requirement that a defendant have certain minimum contacts with the forum state such that maintaining the suit there does not offend traditional notions of fair play and substantial justice.  See 
International Shoe Co. v. Washington
, 326 U.S. 310, 316, 90 L. Ed. 2d 95, 102, 66 S. Ct. 154, 158 (1945); 
Keller v. Henderson
, No. 2--04--1224, slip op. at 7 (August 9, 2005).  Oceanic had contacts with three Illinois corporations involved in this case; Oceanic had fair warning that it could be sued in Illinois.  It directed its activities at this state, carried on continuing relationships with corporate citizens of this state, and derived benefits from its activities in this state; federal due process thus will not be offended by a finding of personal jurisdiction over Oceanic in this case.  See 
Keller
, slip op. at 9.  Further, as Oceanic makes no contention that state due process concerns diverge from federal due process concerns in this case, we determine that personal jurisdiction comports with state due process as well.  See 
Keller
, slip op. at 17.

While an actual written contract is not part of the record, testimony and exhibits regarding Oceanic's dealings with M.J. Select, CCS, and Vorisek, and the inferences drawn therefrom, create a genuine issue of material fact regarding 
in personam
 jurisdiction.  Therefore, we conclude that the trial court erred in granting Oceanic's motion to dismiss based upon a lack of 
in personam
 jurisdiction, and we must remand this cause to the trial court for further proceedings.

Oceanic asserts that this court may affirm the trial court's decision for any reason appearing in the record (see 
Goldberg v. Michael
, 328 Ill. App. 3d 593, 597 (2002)); therefore, it argues that even if personal jurisdiction is found, plaintiffs lack standing to sue under the "shareholder standing" rule, and this court should affirm the dismissal.  The shareholder standing rule bars claims by corporate shareholders where there is no showing that the plaintiff was injured in any capacity other than in common with fellow stockholders; in such a situation, the cause of action belongs to the corporation.  
Mann v. Kemper Financial Cos.
, 247 Ill. App. 3d 966, 975 (1992).  Without addressing each count of the complaint, we note that plaintiffs alleged that they received monthly statements from Oceanic showing a "consistently rising" net worth of their M.J. Select shares.  In July 2001, plaintiffs were informed that their shares yielded a 4.36% drop in value and that all of their shares were to be redeemed.  A few weeks later, plaintiffs were informed that the decrease in share value was being revised to 15.78% and that the loss had been occurring for almost seven months without having been disclosed.  While certain insider investors had received full payout of their share values just prior to the July announcement, plaintiffs' shares "were 
not even remotely liquid
 in nature" (emphasis in original), and plaintiffs had yet to receive any redemption payouts.  These allegations clearly show a claim that plaintiffs were injured by the misleading financial statements and insider cash-outs and that the insider shareholders benefitted.  This is the type of particularized injury that defeats the shareholder standing rule, as it is an injury to plaintiffs, not all shareholders or the corporation itself.  Thus, plaintiffs have standing to sue, and we will not affirm the trial court on this basis.

This court took with the case various motions.  We now grant plaintiffs' motion to file an appendix in support of their reply brief and deny all motions to cite or file supplemental authority and to supplement the record.

For these reasons, the judgment of the circuit court of Kane County is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

BYRNE and CALLUM, JJ., concur.

FOOTNOTES
1:
1
  In 
Keller v. Henderson
, No. 2--04--1224 (August 9, 2005), slip op. at 6, we observed that, in light of section 2--209(c) of the Code (735 ILCS 5/2--209(c) (West 2000)), the long-arm statute is coextensive with due process.  We thus acknowledge that the first step of our analysis is not always necessary.  See 
Keller
, slip op. at 6.  Nevertheless, in the interests of thoroughness, we elect here to employ the traditional, two-step analysis of personal jurisdiction.