VIKTRON LIMITED PARTNERSHIP, Plaintiff-Appellant, v. PROGRAM DATA INCORPORATED, Defendant-Appellee.

Second District    No. 2—00—1445

Opinion filed November 14, 2001.

Thomas J. Fleischmann and Cary S. Fleischer, both of Chuhak & Tecson, P.C., of Chicago, for appellant.

Steven B. Ekker, James P. Marsh, and James F. McCluskey, all of Momkus, Ozog & McCluskey, of Downers Grove, for appellee.

JUSTICE GROMETER delivered the opinion of the court:

Plaintiff, Viktron Limited Partnership (Viktron), appeals the decision of the circuit court of Du Page County dismissing its action against defendant, Program Data Incorporated (PDI), pursuant to section 2—619 of the Civil Practice Law (735 ILCS 5/2—619 (West 2000)). The trial court concluded that it lacked personal jurisdiction over PDI, basing this decision both upon Illinois' long-arm statute (735 ILCS 5/2—209 (West 2000)) and due process concerns (see U.S. Const., amend. V; Ill. Const. 1970, art. I, § 2). The sole issue raised in this appeal is whether the trial court correctly determined that Illinois could not assert *in personam* jurisdiction over PDI. For the reasons that follow, we conclude that it did not.

## BACKGROUND

The following facts are taken from the complaint as well as the affidavits submitted by the parties. Viktron is an Illinois limited partner-

ship with its principal place of business in Carol Stream, Illinois. Viktron manufactures printed circuit boards in California, Utah, Florida, and West Chicago. PDI is a California corporation that manufactures testing equipment that is used in the manufacture of printed circuit boards. PDI's principal place of business is in California, as is its separate testing facility. It maintains no facilities outside California. At issue in the present case is a contract the parties entered into in which Viktron was to purchase four circuit board testers. PDI was to provide one to each of Viktron's four plants in the above-listed states.

The events that culminated in this contract began in March 1997, when PDI learned that a company named Lika was interested in purchasing testers of the type PDI manufactured. Lika had previously approached PDI about such a purchase in 1994. PDI's president, Akin Aksu, and another PDI employee traveled to the Lika facility, which was located in California, to discuss a possible sale. During this visit, PDI learned that Lika had been purchased by Viktron. Viktron expressed interest in PDI's testers but did not have adequate funding for a purchase. Approximately one year later, PDI again sent two representatives to the California plant. Viktron's chief executive officer, Shalabh Kumar, was present and requested a demonstration of the tester's capabilities on Viktron's circuit boards. PDI set up the requested demonstration, which took place in June 1998. Kumar then requested another demonstration.

In July 1998, Kumar traveled to PDI's plant to observe the second demonstration. Kumar then requested another demonstration using different fixtures. This third demonstration also took place in July 1998 at the PDI facility and was attended by Shelley Krueger, Viktron's California engineering manager. However, one board that was to be tested required a larger testing machine. Viktron requested that a demonstration be set up for this board. PDI arranged with one of its customers, also located in California, to test this board on a PDI tester. Krueger attended this demonstration in September 1998. Viktron requested a further demonstration, and Aksu traveled to Viktron's California facility to prepare for it. Subsequently, Krueger visited PDI to discuss certain details regarding PDI's testers.

On November 11, 1998, Aksu sent Kumar a letter discussing PDI testers. The letter was sent to Viktron's West Chicago facility. On November 25, 1998, Viktron's corporate controller, Raj Thakral, called Aksu and requested that he come to Illinois to meet with Kumar. Aksu traveled to Illinois, and the meeting lasted between two and three hours. In his affidavit, Aksu asserts that, during the meeting, Kumar advanced various price-cutting proposals. Aksu states he did not agree with any of these proposals and left "without any agreement on any

terms for purchase of a PDI tester." Kumar asserts, by affidavit, that the meeting involved negotiations concerning "price, quantity, warranty, delivery dates and the layout of the test equipment." Following the meeting, Kumar and Aksu engaged in a series of written and telephonic communications.

On December 7, 1998, Aksu sent Kumar a written price quotation. This correspondence was addressed to Viktron's West Chicago facility. On December 10, 1998, Aksu sent another letter to Kumar in West Chicago. The letter begins with the following statement: "Enclosed please find the confirmation of what we have [sic] discussed during our meeting in Chicago last Thursday." On December 21, 1998, Viktron sent PDI an offer. The offer was accompanied by a down payment. Aksu rejected the offer and, on January 4, 1999, sent Kumar a letter containing a counteroffer.

On January 6, 1999, two PDI engineers went to Viktron's California plant to review its products, and on January 12, 1999, Aksu proposed to Kumar that Aksu would travel there to see if an agreement could still be reached. It is unclear from the record whether this trip occurred. At this point, Aksu asserts, an agreement was not possible, and he returned Viktron's down payment.

Both parties aver that a series of communications followed concerning specifications for the testers. These communications occurred between PDI and all four of Viktron's facilities. On January 19, 1999, Aksu sent Kumar a letter containing PDI's "final offer." Two days later, Viktron wired PDI a down payment of $378,000. Shortly thereafter, Kumar called Aksu and accepted the offer.

Viktron agreed to purchase four testers. The contract required that the first tester be delivered to Viktron's plant in California and that the third be delivered to its Illinois facility. The contract required that PDI train Viktron employees on the use of the testers. Training was to take place at each of Viktron's facilities. The testers themselves were warranted for two years, and switch cards were warranted for seven. The contract obligated PDI to send technicians when necessary to Viktron's four facilities to make repairs. Also, PDI was to provide integration software for the testers and an automation upgrade for each machine at a cost of $100,000. The upgrade was to occur approximately two years from the execution of the contract.

In February 1999, the first tester was delivered to Viktron's California plant. On February 25, 1999, Kumar wrote a letter to Aksu detailing numerous problems Viktron was having with the tester. In this letter, he instructed Aksu to put the balance of the order on hold until further notification. Viktron subsequently canceled the order. No testers were delivered except for the one delivered to the California

plant. In its complaint, which was filed April 16, 1999, Viktron alleges that PDI was still attempting to install the first tester so that it would operate in a proper manner.

After twice attempting to remove this case to federal court, PDI filed a motion to dismiss, alleging the lack of *in personam* jurisdiction. The trial court granted the motion. The trial court concluded that the only contact between PDI and Illinois occurred when the parties met in Illinois. The trial court held that this contact was of little significance because the parties did not reach a complete agreement at that time. Further, the trial court discounted the fact that the contract contemplated partial performance within this state because the contract was terminated prior to the time this performance occurred. According to the trial court, this meant that the dealings between the parties had resulted in no impact being felt in Illinois. The trial court also noted that the burden of defending this action in Illinois would be significant for PDI and believed that Illinois did not have a substantial interest in the dispute because the agreement had not been consummated in Illinois. Following this ruling, plaintiff perfected this appeal.

## ANALYSIS

■■ Viktron argues that the trial court erred in determining that personal jurisdiction over PDI was lacking. The trial court held no evidentiary hearing on PDI's motion attacking jurisdiction; therefore, review is *de novo. E.A. Cox Co. v. Road Savers International Corp.*, 271 Ill. App. 3d 144, 148 (1995). A plaintiff bears the burden of establishing a basis for personal jurisdiction over a nonresident defendant. *G.M. Signs, Inc. v. Kirn Signs, Inc.*, 231 Ill. App. 3d 339, 341 (1992). In determining whether such a basis exists, we may consider a plaintiff's complaint and any affidavits submitted by the parties. *E.A. Cox Co.*, 271 Ill. App. 3d at 148. Unrebutted allegations are taken as true. *Doolin v. K-S Telegage Co.*, 75 Ill. App. 3d 25, 29 (1979). In the event of a material evidentiary conflict, we must remand the matter to the trial court for an evidentiary hearing. *Kalata v. Healy*, 312 Ill. App. 3d 761, 765 (2000).

In the present case, we base our decision primarily on two undisputed facts. First, according to Kumar's affidavit, Aksu came to Illinois and met with Kumar. During this meeting, the parties negotiated the price, quantity, delivery dates, and layout of the testers. In his affidavit, Aksu asserts that Kumar proposed various price cuts during the meeting, but he does not dispute that the matters set forth in Kumar's affidavit were discussed. It is also undisputed that an agreement was not reached at this meeting. Second, it is undisputed that partial performance of this contract was to take place in Illinois.

This performance included delivery of one tester as well as subsequent service and support. Additional facts will be discussed where relevant.

■ The resolution of this appeal requires a three-part analysis. In determining if personal jurisdiction exists, courts must consider whether the assertion of jurisdiction comports with the Illinois long-arm statute, the due process guarantee of the United States Constitution, and the constraints imposed by the Illinois Constitution's due process guarantee. *Rollins v. Ellwood*, 141 Ill. 2d 244, 275 (1990). We note that there is no allegation that PDI has such contacts with this state as to subject it to general *in personam* jurisdiction; thus, our analysis is confined to whether an exercise of specific *in personam* jurisdiction is proper. See J. Parness, Illinois Civil Procedure §§ 2—3(a)(2)(iv)(A), (a)(2)(iv)(B) (1998). We first turn to our long-arm statute (735 ILCS 5/2—209 (West 2000)).

## Illinois' Long-Arm Statute

■ The long-arm statute provides numerous bases for the exercise of jurisdiction over a nonresident defendant. One relevant here grants jurisdiction over a party regarding "[t]he making or performance of any contract or promise substantially connected with this State." 735 ILCS 5/2—209(a)(7) (West 2000). In the present case, facts exist showing that the making and the performance of the contract were both connected to Illinois. It is undisputed that Aksu came to Illinois and negotiated the contract. Further, PDI sent numerous correspondences into Illinois in furtherance of these negotiations. Additionally, it is undisputed that the contract contemplated delivery and additional service and support within Illinois.

Defendant relies on *Ideal Insurance Agency, Inc. v. Shipyard Marine, Inc.*, 213 Ill. App. 3d 675 (1991), in arguing that the contract was not substantially connected with this state. In that case, this court set forth a multifactor test to assess whether the defendant's conduct relative to a contractual transaction was sufficient to establish that the defendant had transacted business in Illinois. *Ideal Insurance Agency*, 213 Ill. App. 3d at 680. That case addressed section 2—209(a)(1) of the long-arm statute (see 735 ILCS 5/2—209(a)(1) (West 2000)) instead of section 2—209(a)(7) (735 ILCS 5/2—209(a)(7) (West 2000)), which is at issue here. Nevertheless, we find the factors enumerated in *Ideal Insurance Agency* to be of some guidance here, where the question is whether the contract is substantially connected with this state (735 ILCS 5/2—209(a)(7) (West 2000)).

■ The factors set forth in *Ideal Insurance Agency* are (1) who initiated the transaction, (2) where the contract was formed, and (3) where performance was to take place. *Ideal Insurance Agency*, 213 Ill.

App. 3d at 680. In its brief, PDI has modified this test somewhat. It adds a fourth factor, where the contract was negotiated. Although this factor was not set forth in *Ideal Insurance Agency*, it is clearly relevant to this inquiry. See *Buxton v. Wyland Galleries Hawaii*, 275 Ill. App. 3d 980, 983 (1995). Additionally, PDI sets forth the third factor as "where the contract was substantially performed." In *Ideal Insurance Agency*, the third factor was articulated as where performance *was to* take place. This difference is significant. PDI's version of the test implies that the only consideration is where some actual performance took place; conversely, as formulated in *Ideal Insurance Agency*, the factor encompasses a jurisdiction where performance is contemplated.

Turning to the first factor, PDI contends that it is undisputed that Viktron solicited the contract and cites Aksu's affidavit in support. Aksu avers that Viktron's predecessor, Lika, first approached PDI. Three years later, PDI believed Lika was in the market for test equipment and sent representatives to the Lika plant. At this point, PDI learned Viktron had purchased Lika, and Viktron expressed interest in PDI testers. PDI does not attempt to explain why Viktron should be charged with the acts of its predecessor, and any such argument is thus waived (see *McCleary v. Board of Fire & Police Commissioners*, 251 Ill. App. 3d 988, 995 (1993) ("Mere contentions, without argument or citations of authority, do not merit consideration on appeal")). Given that PDI sent its employees to Viktron's plant, we fail to see how Aksu's affidavit establishes that Viktron approached PDI.

Second, PDI asserts that the contract was formed in California. PDI notes that Aksu faxed a final offer to Kumar, and Kumar telephoned Aksu, who was in California at the time, to accept. We are reluctant to rely on the traditional formalities of offer and acceptance in determining whether a contract is substantially connected to this state. See *Met-L-Wood Corp. v. Lifetime Pools, Inc.*, 475 F. Supp. 149, 151 (N.D. Ill. 1979) ("Formalities of contract execution are not determinative for purposes of jurisdiction"). In the present circumstances, where the parties engaged in substantial communications between and within the two states involved, the locations of the parties when the words "I accept" were uttered are entitled to little weight.

Third, PDI contends that the negotiations regarding this contract took place largely in California and the single meeting in Illinois is an insufficient basis for jurisdiction. Accepting these allegations as true, this argument is ill taken. *In personam* jurisdiction is not a contest between two states, the winning state being the one with the most contacts and thus able to assert jurisdiction. See *Buxton*, 275 Ill. App. 3d at 983 ("Minimum contacts analysis recognizes that two or more

States may properly assume jurisdiction over a particular dispute"). Conduct that would provide a basis for California to assert jurisdiction is irrelevant in determining whether a contract is substantially connected with Illinois; rather, the proper inquiry focuses on the defendant's conduct relative to this state. *E.A. Cox Co.*, 271 Ill. App. 3d at 150. Accordingly, PDI's assertion that a large part of the negotiations took place in California has no bearing on our decision. Rather, we must focus on the fact that Aksu came to Illinois and negotiated the contract. Such conduct supports an exercise of jurisdiction by this state. See *First National Bank of Chicago v. Boelcskevy*, 126 Ill. App. 3d 271, 274 (1984) ("When a defendant comes to Illinois and engages in negotiations of some substance regarding the transaction from which the cause of action arises, then the defendant submits to jurisdiction under the long-arm statute").

Fourth, we conclude that substantial performance of the contract was to take place in Illinois. The contract contemplated the delivery of a piece of equipment worth over $300,000 to Viktron's Illinois plant. Further, the contract required PDI to train Viktron employees in Illinois and provide service in Illinois, as necessary, pursuant to the warranties it made. These warranties ran from two to seven years. The contract also mandated a $100,000 upgrade to the Illinois tester to occur approximately two years after the execution of the contract. Thus, the contract contemplated more than a simple sale of goods. It established a relationship between the parties that would last for at least two years. Such a relationship is sufficient to establish personal jurisdiction. See *Buxton*, 275 Ill. App. 3d at 983 ("Where there is an ongoing commercial relationship, each party will typically have a substantial jurisdictional claim at home against the other"). Moreover, that the contract also contemplated performance in other states is of no moment. In holding in *E.A. Cox Co.* that jurisdiction existed over a nonresident defendant, the court relied on the fact that partial performance was to occur in Illinois. *E.A. Cox Co.*, 271 Ill. App. 3d at 149. Further, as we noted above, asserting *in personam* jurisdiction is not a contest between various states. See *Buxton*, 275 Ill. App. 3d at 983.

Both the trial court and PDI relied on Viktron's termination of the contract prior to any actual performance in Illinois as support for the proposition that personal jurisdiction is improper in Illinois in this case. This position ignores well-settled case law that holds that what is important is where performance is contemplated. See *E.A. Cox Co.*, 271 Ill. App. 3d at 149; *Swissland Packing Co. v. Cox*, 255 Ill. App. 3d 942, 943-44 (1994); *First National Bank of Chicago*, 126 Ill. App. 3d at 274; *Colony Press, Inc. v. Fleeman*, 17 Ill. App. 3d 11, 18 (1974). A rule based on actual performance would lead to the absurd result that a

defendant who breaches a contract by shipping nonconforming goods into the state would be submitting to jurisdiction while one who breaches by completely failing to ship the goods would not. We decline to adopt such a rule here.

▮ Accordingly, we conclude that the application of the four-factor test set forth in *Ideal Insurance Agency* indicates that jurisdiction exists under our long-arm statute. The first factor, who solicited the contract, and the third, the place of execution, do not strongly favor either party. The second, where the contract was negotiated, supports jurisdiction because negotiations regarding several terms of the contract occurred in this state. The fourth, the contemplated place of performance, strongly favors jurisdiction because substantial performance over a period of years was contemplated in Illinois.

Moreover, an alternate basis for jurisdiction exists under our long-arm statute. The statute provides that "[a] court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2—209(c) (West 2000). This provision has been interpreted to mean that "an Illinois court may exercise personal jurisdiction over a nonresident defendant as long as the exercise of such jurisdiction offends neither federal nor state guarantees of due process." *Flint v. Court Appointed Special Advocates of Du Page County, Inc.*, 285 Ill. App. 3d 152, 165 (1996). Accordingly, we now turn to the due process guarantees of the state and federal constitutions, and, if we conclude that an exercise of jurisdiction comports with their strictures, a second basis for jurisdiction exists under the long-arm statute.

### Federal Due Process

▮▮ An exercise of *in personam* jurisdiction does not offend the federal due process guaranty so long as a defendant has certain "minimum contacts" with the forum state such that the maintenance of an action there comports with " 'traditional notions of fair play and substantial justice.' [Citation.]" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158 (1945). The minimum contacts relevant to this determination must involve "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 1298, 78 S. Ct. 1228, 1240 (1958). These requirements are not satisfied by contacts that are merely random, fortuitous, or attenuated or by contacts that result from the unilateral actions of third parties. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 542, 105 S. Ct. 2174, 2183 (1985). A defendant's

conduct and connection to the forum state must be such that "he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 501, 100 S. Ct. 559, 567 (1980). In determining whether federal due process standards have been met, a court must consider the following three factors: (1) whether the nonresident defendant has sufficient minimum contacts with the forum state, (2) whether the cause of action arises out of these contacts, and (3) whether it is reasonable to require the defendant to litigate in the forum state. *Autotech Controls Corp. v. K.J. Electric Corp.*, 256 Ill. App. 3d 721, 725 (1993), citing *Burger King Corp.*, 471 U.S. at 471-77, 85 L. Ed. 2d at 540-44, 105 S. Ct. at 2181-84.

■ We first turn to the question of whether PDI had sufficient minimum contacts with this state to support an exercise of *in personam* jurisdiction. In *Burger King Corp.*, the Supreme Court noted that the mere existence of a contract between an individual in the forum state and a nonresident does not automatically establish minimum contacts. *Burger King Corp.*, 471 U.S. at 478-79, 85 L. Ed. 2d at 544-45, 105 S. Ct. at 2185. The court noted that it had "long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests, [citation], or on 'conceptualistic ... theories of the place of contracting or of performance,' [citation]." *Burger King Corp.*, 471 U.S. at 478, 85 L. Ed. 2d at 545, 105 S. Ct. at 2185. Instead, the court emphasized an approach that recognizes that a contract is an intermediate step that serves to "tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King Corp.*, 471 U.S. at 479, 85 L. Ed. 2d at 545, 105 S. Ct. at 2185. Thus, a court must focus on prior negotiations and future consequences, along with the terms of the contract and the course of dealing between the parties, in assessing whether the defendant purposely established minimum contacts with the forum state. *Burger King Corp.*, 471 U.S. at 479, 85 L. Ed. 2d at 545, 105 S. Ct. at 2185. When a defendant has deliberately engaged in significant activities within the forum state or has created continuing obligations with a resident of the forum state, the defendant has accepted the privilege of conducting business within the forum state, and it is not unreasonable to require the defendant to litigate there. *Burger King Corp.*, 471 U.S. at 475-76, 85 L. Ed. 2d at 543, 105 S. Ct. at 2184.

In the present case, PDI has both deliberately engaged in negotiations in Illinois and obligated itself to perform a substantial portion of the contract within this state. In *Burger King Corp.*, personal jurisdiction was held proper where a Michigan defendant entered into a 20-year franchise contract that envisioned a continuing relationship with

a plaintiff located in Florida. *Burger King Corp.*, 471 U.S. at 480, 85 L. Ed. 2d at 545, 105 S. Ct. at 2186. The Supreme Court observed that, given the defendant's voluntary acceptance of the long-term and exacting regulation of his franchise from the plaintiff's Florida headquarters, contacts with Florida were neither random, fortuitous, nor attenuated. *Burger King Corp.*, 471 U.S. at 480, 85 L. Ed. 2d at 545-46, 105 S. Ct. at 2186. The Court finally noted that the defendant's failure to make payments in Miami, along with his continued use of the company's trademark, caused foreseeable injuries to the plaintiff in Florida. *Burger King Corp.*, 471 U.S. at 480, 85 L. Ed. 2d at 546, 105 S. Ct. at 2186. A similar situation presents itself in the instant case. PDI voluntarily entered into a contract that required it to deliver goods to Illinois and provide training, service, and support in this state. While the agreement in *Burger King Corp.* was of a longer duration, we do not believe that distinguishes the present situation substantially. PDI had continuing obligations in Illinois, and, because PDI assumed them voluntarily, its contacts with this state were not random, fortuitous, or attenuated. Like the defendant in *Burger King Corp.* who failed to make required payments in Miami, PDI is alleged to have failed to fulfil contractual obligations here. This alleged nonperformance caused foreseeable injuries in this state.

Further, support for an exercise of jurisdiction is even more compelling in the instant case than in *Burger King Corp.* In *Burger King Corp.*, the defendant had no physical ties to Florida whatsoever. *Burger King Corp.*, 471 U.S. at 479, 85 L. Ed. 2d at 545, 105 S. Ct. at 2186. In the present case, PDI entered Illinois and engaged in negotiations. The Supreme Court recognized that "territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there." *Burger King Corp.*, 471 U.S. at 476, 85 L. Ed. 2d at 543, 105 S. Ct. at 2184. Relying on an unpublished memorandum opinion and order of the United States District Court for the Northern District of Illinois, PDI argues that the fact that PDI entered the state and negotiated the contract is entitled to little weight because PDI did so at Viktron's urging. See *Pathway Financial v. Heaton*, No. 86—C—9089 (N.D. Ill. April 21, 1989). Even if we were to accept this proposition, our conclusion would remain unchanged in light of the substantial obligations to which PDI obligated itself in this state. Assuming PDI's presence in Illinois is entitled to little weight, it is still a greater contact than existed in *Burger King Corp.* The defendant in that case did not enter the forum state at all. Accordingly, we hold that sufficient minimum contacts exist between PDI and Illinois such that PDI should have reasonably anticipated the possibility of being haled into court in Illinois.

The second factor need not detain us long. Viktron complains of a breach of contract, and, as noted above, that contract was substantially connected to Illinois both by the negotiations that occurred here and the fact that PDI obligated itself to perform here. As such, Viktron's cause of action arises out of PDI's contacts with this state. We note that PDI points out, at various places in its brief, that Viktron is seeking damages solely for events occurring in California. Viktron has alleged various damages, and some clearly are limited to events in California. For example, in one paragraph, Viktron seeks damages for lost profits at the California plant. However, in a separate paragraph, Viktron has also alleged that it has suffered $2 million in lost profits as a result of advertising the availability of the test system. Since Viktron specifically alleged lost profits at the California plant in one paragraph and then generally alleged additional lost profits in another paragraph, it is apparent that the latter allegation seeks damages for events beyond those occurring in California.

We now turn to the third consideration—whether it is reasonable to require the defendant to litigate here. The Supreme Court has set forth the following five factors to guide this inquiry: (1) the burden on the defendant of defending the action in the forum state, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the action, and (5) the shared interests of the several states in advancing fundamental social policies. *World-Wide Volkswagen Corp.*, 444 U.S. at 292, 62 L. Ed. 2d at 498, 100 S. Ct. at 564. Once it has been established that a defendant has purposely directed his activities at the forum state, the defendant must present a compelling case that litigating the dispute there would be unreasonable. *Burger King Corp.*, 471 U.S. at 477, 85 L. Ed. 2d at 544, 105 S. Ct. at 2184-85. We conclude that PDI has not met this burden.

The first factor we consider is the burden on PDI of defending this action in Illinois. PDI points out that virtually all of the witnesses, documentary evidence, and the tester itself are located in California. PDI asserts that all of these witnesses and evidence would have to be brought to Illinois at great expense. It has been held, however, that when a defendant enters the forum state in furtherance of a business transaction, it is not unreasonable or unduly burdensome to require the defendant to return and litigate there. See *La Salle National Bank of Chicago v. Akande*, 235 Ill. App. 3d 53, 60 (1992); *Ronco, Inc. v. Plastics, Inc.*, 539 F. Supp. 391, 400 (N.D. Ill. 1982). It is undisputed that PDI entered Illinois to negotiate portions of the contract. Furthermore, as the Supreme Court noted, such concerns can be ad-

dressed properly through a change of venue. *Burger King Corp.*, 471 U.S. at 477, 85 L. Ed. 2d at 544, 105 S. Ct. at 2185. In appropriate circumstances, a defendant can, under Illinois law, effectuate an interstate transfer of a case through a *forum non conveniens* motion. See *Torres v. Walsh*, 98 Ill. 2d 338, 344-52 (1983). We express no opinion on the propriety of such a transfer in the present case and merely conclude that the inconvenience PDI points to does not rise to a constitutional dimension. See *Culligan International Co. v. Wallace, Ross, & Sims*, 273 Ill. App. 3d 230, 233 (1995) ("The inconvenience of litigating in the forum need not rise to constitutional dimensions to make a convincing argument that the forum is the wrong place to require the defendant to litigate").

Regarding the second factor, PDI asserts that Illinois' interest in this dispute is limited to the fact that one of its residents is involved. However, a state generally has a manifest interest in providing its residents with a convenient forum in which to litigate. *Burger King Corp.*, 471 U.S. at 473, 85 L. Ed. 2d at 541, 105 S. Ct. at 2182. While PDI believes that California would be a convenient forum for Viktron as well, it is noteworthy that Viktron chose to bring this action here. Illinois clearly has an interest in allowing Viktron to seek relief in an Illinois court.

Third, we consider Viktron's interest in litigating in Illinois. Viktron is an Illinois limited partnership with its principal place of business in this state. Viktron has chosen to seek relief in this state. These facts indicate that Viktron has an interest in litigating in Illinois. PDI presents nothing, other than the fact that Viktron does business in California, that would indicate a contrary conclusion. None of the arguments presented on this point are particularly compelling, and it is PDI's burden at this point to present a compelling case that an exercise of jurisdiction would be unreasonable. See *Burger King Corp.*, 471 U.S. at 477, 85 L. Ed. 2d at 544, 105 S. Ct. at 2184-85.

Fourth, regarding the interest of the interstate judicial system in efficiently resolving this dispute, PDI relies on the same argument it set forth regarding the first factor. PDI contends that the interests of the interstate judicial system would be better served by litigating in California because most of the witnesses and evidence are located there. However, as noted above, these factors can be accommodated through other means. Further, the burden of transporting evidence and witnesses to Illinois would appear to fall on the parties rather than the interstate judicial system, and we have addressed their interests above.

Finally, we consider the shared interests of the several states in advancing fundamental social policies. PDI argues that to allow a

forum resident to force a nonresident corporation with virtually no ties to a state to litigate a dispute that arose entirely outside the state would dissuade out-of-state entities from doing business with the state's residents. PDI cites no authority in support of this proposition, which depends on several unfounded assumptions regarding whether PDI has ties to this state and whether the suit arose out of events occurring entirely outside this state. We have located a countervailing policy. In *Autotech Controls Corp.*, 256 Ill. App. 3d 721, the First District reversed an order of a trial court that dismissed a case for lack of personal jurisdiction. In so doing, the court noted the following:

> "Furthermore, an affirmation of the trial court's granting of defendant's motion would set a precedent which could be invoked to bar Illinois companies that have contracted with nonresident corporations to sell goods manufactured in Illinois from vindicating their rights by suing such corporations in Illinois courts. This would have catastrophic implications for Illinois commerce." *Autotech Controls Corp.*, 256 Ill. App. 3d at 727-28.

Although *Autotech Controls Corp.* involved a resident seller rather than a buyer, the policy considerations are valid here. Allowing a nonresident seller to assume substantial obligations within this state and breach them with the knowledge that the buyer would be precluded from litigating here and be forced to travel to a distant forum would have consequences similar to those that the *Autotech Controls Corp.* court feared. Further, both California and Illinois recognize a public policy favoring the enforcement of contracts. See *City of Chicago v. Chicago Fiber Optic Corp.*, 287 Ill. App. 3d 566, 577 (1997); *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 462, 11 Cal. Rptr. 2d 330, 331 (1992). Such a policy is served by allowing the victim of a breach of contract to assert a cause of action in the forum it chooses.

Taking all five factors into consideration, we conclude that PDI has not presented a compelling case that jurisdiction in Illinois is unreasonable. Beyond the location of many of the witnesses and the evidence, nothing supports PDI's assertion that being forced to litigate in Illinois would be unreasonable. Further, Illinois clearly does have an interest in adjudicating this dispute and public policy favors allowing the suit to proceed in this forum. Accordingly, we conclude that an exercise of personal jurisdiction over PDI is not inconsistent with federal due process protections.

## Illinois Due Process

■ Finally, we consider whether the Illinois due process guaranty precludes an exercise of jurisdiction in this case. PDI correctly notes that the Illinois guaranty of due process is not coextensive with federal

due process protections. See *Rollins v. Ellwood*, 141 Ill. 2d 244, 275 (1990). Rather, in Illinois, jurisdiction can be asserted only if "it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins*, 141 Ill. 2d at 275. PDI focuses its argument on the lack of a significant number of acts occurring within this state. However, PDI ignores the substantial obligations, set forth above, that it voluntarily assumed regarding performance within this state. Under the standard set forth by our supreme court, these obligations were relevant, and PDI's alleged failure to complete them clearly affected interests located in Illinois. As such, we conclude an exercise of jurisdiction under the present circumstances comports with Illinois' due process guaranty.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the circuit court of Du Page County and remand this cause for further proceedings.

Reversed and remanded.

HUTCHINSON, P.J., and BOWMAN, J., concur.