FOURTH DIVISION
FILED: August 2, 2007

Nos. 1-06-1310, 1-06-1386, 1-06-1478 (Consolidated)

| | | |
|---|---|---|
| CRUM & FORSTER SPECIALTY INSURANCE CO. and DIAMOND STATE INSURANCE CO., | ) ) ) | |
| Counterplaintiffs-Appellants, | ) ) | Appeal from the Circuit Court of Cook County |
| (Firemen's Fund Insurance Co., Counterplaintiff.) | ) ) ) | |
| v. | ) ) | No. 05 CH 1686 |
| EXTENDED STAY AMERICA, INC., EXTENDED STAY, INC., ESA MANAGEMENT L.L.C., HVM L.L.C., BRE/ESA PROPERTIES L.L.C., BRE/ESA PROPERTIES L.L.C, BRE/ESA TX PROPERTIES L.P., BRE/ESA FL PROPERTIES L.L.C., BRE/ESA MN PROPERTIES L.L.C., and BRE/ESA MD PROPERTIES BUSINESS TRUST, | ) ) ) ) ) ) ) ) ) | Honorable Julia M. Nowicki, Judge Presiding |
| Counterdefendants-Appellees. | ) | |
| _____ | ) ) | |
| (Transportation Insurance Company, | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| Quaker Window Products Co., Inc., Weather-Tite, Inc., Extended Stay America, Inc., Extended Stay, Inc., ESA Management LLC, HVM LLC, BRE/ESA Properties LLC, BRE/ESA PA Properties LLC, BRE/ESA TX Properties LLC, BRE/ESA FL Properties LLC, BRE/ESA MN Properties LLC, BRE/ESA MD Properties Management Trust, Hartford Fire Insurance Co., Columbia Mutual Insurance Company, Executive Risk Specialty Insurance Co., Firemen's Fund Insurance Co., Crum & Forster Specialty Insurance Co., Diamond State Insurance Co., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

Nos. 1-06-1310, 1-06-1386, 1-06-1478 (Consolidated)


Defendants.)                                                     )

JUSTICE MURPHY delivered the opinion of the court:

Extended Stay America (ESA), Inc. filed numerous law suits against Weather-Tite, Inc.

(Weather-Tite) and Quaker Window Products Company, Inc. (Quaker) after purchasing allegedly

defective windows.  Two of Quaker's insurers, Crum & Forster Specialty Insurance Company

(Crum & Forster) and Diamond State Insurance Company (Diamond State), through

counterclaims, sought a declaration that they did not have an obligation to defend or indemnify

Quaker in the windows cases.  The trial court dismissed the counterclaims on the grounds that (1)

it lacked personal jurisdiction over certain ESA entities and (2) those entities were necessary

parties without which the case could not proceed.  On appeal, Crum & Forster and Diamond

State argue that the trial court erred in dismissing the counterclaims for lack of personal

jurisdiction because the entities had the requisite contacts with Illinois to establish jurisdiction

and, even if jurisdiction did not exist, that the "doctrine of representation" applied.  For the

following reasons, we affirm.

## I.  BACKGROUND

### A.  Windows Contract

Before 2004, ESA, Inc. operated a chain of hotels throughout the country and owned

property in all 50 states.  In 1995, it entered into a contract (national accounts contract) with

Weather-Tite, an Illinois corporation, to supply windows for installation in ESA, Inc.'s hotels on

a national scale.  Quaker, a Missouri corporation, manufactured the windows, and Weather-Tite

distributed them.  Between 1996 and 2003, ESA, Inc. installed the windows in more than 200

hotels all over the country. The windows leaked, and in 2003, ESA, Inc. filed law suits against Quaker and Weather-Tite in 12 states.

### B. Changes in ESA's Corporate Structure

In 2004, during the pendency of the underlying window litigation, an affiliate of the Blackstone group acquired ESA, Inc. It merged ESA, Inc. out of existence and created Extended Stay, Inc., a real estate investment trust. Ownership of the ESA hotels was transferred from ESA, Inc. to six new, indirect subsidiaries of Extended Stay, Inc.: BRE/ESA FL Properties L.L.C., BRE/ESA MN Properties L.L.C., BRE/ESA TX Properties L.P., BRE/ESA MD Properties Business Trust, BRE/ESA PA Properties L.L.C. (collectively, the state entities), and BRE/ESA Properties L.L.C.

The state entities became owners of the ESA hotels located in Florida, Minnesota, Texas, Maryland, and Pennsylvania, respectively. BRE/ESA Properties L.L.C. became the owner of all other ESA hotels, including those located in Illinois. These hotels were part of the national accounts contract, which was in place until 2003.

BRE/ESA Mezz L.L.C. was the first direct owner of the state entities, followed by BRE/ESA Mezz 2 L.L.C., and so on through BRE/ESA Mezz 8 L.L.C. ESA Management L.L.C. owned the BRE/ESA Mezz 1 through 8 entities. Extended Stay, Inc. owned ESA Management L.L.C.

The state entities leased their respective hotels to BRE/ESA Operating Lessee, Inc., which conducted business in Illinois. The operating lease agreement defined the term "landlord" as the state entities and BRE/ESA Properties, L.L.C. The lease also provided that the landlord

was an indirect, wholly owned subsidiary of "Holdings," which was defined to mean ESA. The state entities assigned to BRE/ESA Operating Lessee "to the maximum extent provided by law *** rights to proceed against any predecessors in title, contractors and materialmen for breaches of warranties or representations or for latent defects in the Leased Property." A third-party manager, HVM L.L.C., operated and managed the hotels pursuant to a management agreement between Operating Lessee and HVM's predecessor.

Each state entity maintains separate books, files its own tax returns, and keeps separate financial statements. The entities are organized under the laws of Delaware, and they maintain their administrative offices in South Carolina and New York. None of the state entities owns property or assets, has offices or employees, has engaged in sales activities, or has received any earnings from activities in Illinois. Further, none pays taxes, is licensed to do business, conducts any advertising, has registered agents, or maintains bank accounts in Illinois.

In addition, an agreement provided that all ESA hotels, including those owned by the state entities and those owned in Illinois, were included in ESA's centralized marketing and reservations system.

### C. Coverage Action

After the restructuring, the ESA state entities also filed suits against Quaker and Weather-Tite, in states outside of Illinois. In response to the suits from all of the ESA entities, Quaker sought defense from its eight liability insurers, including Transportation, Crum & Forster, and Diamond State, under liability policies that were in place between 1996 and 2003. Transportation, one of the insurers, filed a declaratory action in Cook County seeking a

determination as to whether it owed Quaker a duty to defend or indemnify against the window claims. Transportation's action named Quaker, Weather-Tite, Quaker's other liability insurers, and all 10 ESA entities that were plaintiffs in the underlying tort actions, including the state entities, as defendants.

Three of Quaker's insurers, Crum & Forster, Diamond State, and American Automobile, filed counterclaims seeking similar declarations. The ESA defendants moved to dismiss the complaint and all counterclaims on the basis that (1) the trial court lacked personal jurisdiction over the ESA state entities because they had no contacts with Illinois and (2) the ESA state entities were necessary parties without which the coverage action could not proceed.

Before the hearing on the motion to dismiss, five of the insurers entered into a settlement agreement that resolved the ESA tort claims against Quaker and its claims for defense or indemnity under those insurance policies. The settlement agreement is not included in the record; however, trial-court pleadings described that ESA would become a judgment creditor of Quaker and would seek to satisfy the portion of the judgment not fully funded by the settling insurers' policies by filing a "reach and apply" action against the proceeds on Quaker's insurance policies in Missouri. ESA reached a separate settlement with Weather-Tite. Crum & Forster, Diamond State, and American Automobile were the only insurers that refused to settle. Accordingly, the trial court only heard the ESA defendants' motion to dismiss the counterclaims of Crum & Forster, Diamond State, and American Automobile.

The trial court determined that it did not have personal jurisdiction over the ESA state entities. Furthermore, it dismissed the case in its entirety because the state entities were

necessary parties. Crum & Forster and Diamond State now appeal the trial court's dismissal of their counterclaims. American Automobile did not appeal the dismissal of its counterclaim.

## II. ANALYSIS

### A. Personal Jurisdiction

For purposes of determining personal jurisdiction, a plaintiff carries the burden of establishing a *prima facie* basis upon which jurisdiction over the defendant can be exercised. *Palen v. Daewoo Motor Co., Ltd.*, 358 Ill. App. 3d 649, 659 (2005). A plaintiff's *prima facie* case may be overcome by a defendant's uncontroverted evidence that defeats jurisdiction. *Palen*, 358 Ill. App. 3d at 659. When a trial court determines jurisdiction solely on the basis of documentary evidence and hears no courtroom testimony, we review the issue of jurisdiction *de novo*. *Palen*, 358 Ill. App. 3d at 659.

#### 1. Specific Jurisdiction Under Section 2-209(a)

In determining whether an Illinois court may assert personal jurisdiction over a nonresident defendant, we traditionally use a two-prong analysis, evaluating whether the facts of the case meet the requirements for (1) personal jurisdiction under the Illinois long-arm statute and (2) due process under both the United States and Illinois constitutions. *Commerce Trust Co. v. Air 1st Aviation Companies, Inc.*, 366 Ill. App. 3d 135, 140 (2006). The long-arm statute enumerates 14 specific acts upon which jurisdiction over a nonresident defendant can be exercised. 735 ILCS 5/2-209(a) (West 2004). Crum & Forster and Diamond State assert two of those acts as bases for jurisdiction over the state entities: the transaction of business within Illinois and the making or performance of a contract substantially connected with Illinois.

The two-step analysis has been considered unnecessary, however, because section 2-209(c), commonly referred to as a "catch-all provision," extends the scope of the statute to allow a court to "exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c) (West 2004); *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 357 Ill. App. 3d 381, 383 (2005). Thus, the long-arm statute has been held to be coextensive with the due process requirements of the Illinois and United States Constitutions. *Kostal*, 357 Ill. App. 3d at 383. For the sake of thoroughness, we will employ the traditional two-step approach to address the arguments raised by Crum & Forster and Diamond State. See *LaRochelle v. Allamanian*, 361 Ill. App. 3d 217, 222 n. 1 (2005).

Crum & Forster and Diamond State first assert that the exercise of personal jurisdiction over the state entities is proper because the national account contract between ESA, Inc. and Weather-Tite was performed, in part, in Illinois and the hotels transferred to the state entities in 2004 were subject to the national account contract. In determining whether a defendant's conduct relative to a contract was sufficient to establish jurisdiction, the court analyzes three factors: (1) who initiated the transaction, (2) where the contract was formed, and (3) where performance was to take place. *Viktron Ltd. Partnership v. Program Data Inc.*, 326 Ill. App. 3d 111, 118 (2001). Where the contract was negotiated is also relevant. *Viktron*, 326 Ill. App. 3d at 118.

Crum & Forster and Diamond State rely heavily on the fact that Weather-Tite, the company with whom ESA, Inc. contracted in 1995, is an Illinois corporation and that the

windows were to be installed nationwide, including in Illinois. However, they make no mention of the other factors, *i.e.*, who initiated the national account contract, where it was executed, and where it was negotiated. The ESA/Weather-Tite contract is not included in the record.

Furthermore, the national account contract was between Weather-Tite and ESA, Inc. The state entities were not parties to the contract, which was in effect from 1995 to 2003. While Crum & Forster and Diamond State argue that the state entities can sue for breach of the national accounts contract because they were third-party beneficiaries of it, the state entities' only interest as beneficiaries of the contract is in the hotels in their respective states--not the hotels in Illinois.

Crum & Forster and Diamond State argue that the trial court also had jurisdiction under section 2-209(a)(1) because the state entities transacted business in Illinois through their agent. "The focus of our inquiry is not upon the amount of commercial activity occurring between the parties outside of Illinois, but rather, it is upon the defendant's activities within the State and whether those activities are sufficient to subject it to the *in personam* jurisdiction of the Illinois courts." *Kalata v. Healy*, 312 Ill. App. 3d 761, 767 (2000).

Crum & Forster and Diamond State point to a provision of the lease that provides, "Landlord hereby assigns to Tenant all Landlord's rights to proceed against any predecessor in title, contractors and materialmen for breaches of warranties or representations or for latent defects in the Leases Property." Therefore, they contend, the lessee could enforce the state entities' contractual rights as to all of the hotels owned by ESA, Inc., including those in Illinois. We disagree. Because the state entities do not own any property in Illinois, they likewise did not assign the lessee contractual rights with respect to any Illinois hotels. See *Kalata*, 312 Ill. App.

3d at 767 (a plaintiff's claim must be one that lies in the wake of commercial activities by which the defendant submitted to the jurisdiction of Illinois courts).

Furthermore, the lessee leases hotels in Illinois from BRE/ESA Properties L.L.C., not from any of the state entities, which do not own property in Illinois. Jurisdiction does not result simply because the entity that leases the state entities' hotels in other states also happens to lease hotels in Illinois from another entity. Additionally, the lessee does not operate hotels in any state, but rather, leases hotels that HVM manages and operates.

We find that Crum & Forster and Diamond State failed to show that the state entities committed one of the enumerated acts described in section 2-209(a).

### *2. General Jurisdiction Under Section 2-209(b)(4)*

Crum & Forster and Diamond State assert that the trial court had jurisdiction over the state entities pursuant to section 2-209(b)(4) because they were "doing business" in Illinois. There is no precise test for determining whether a foreign corporation is "doing business" in Illinois. *Haubner v. Abercrombie & Kent International, Inc.*, 351 Ill. App. 3d 112, 119 (2004). Rather, a court must perform a case-by-case analysis to determine if the corporation is conducting business of such character and extent as to warrant the inference that the corporation has subjected itself to the jurisdiction and laws of the foreign state. *Haubner*, 351 Ill. App. 3d at 119. The corporation must transact its business within the state "not occasionally or casually, but with a fair measure of permanence and continuity." *Haubner*, 351 Ill. App. 3d at 119. The "doing business" standard is "quite high." *Haubner*, 351 Ill. App. 3d at 119.

Crum & Forster and Diamond State claim that the state entities were "doing business" in

Illinois in four ways: (1) through the lease agreement, (2) through the national account contract, (3) through an agreement that required all ESA hotels to be included in centralized marketing and reservations systems, and (4) through the parent company that indirectly owns the state entities. For the reasons articulated above, we reject Crum & Forster and Diamond State's argument based on the first two grounds.

We also reject Crum & Forster and Diamond State's argument that personal jurisdiction exists because an agreement required all ESA hotels to be included in one centralized reservation system and national advertising program. Crum & Forster and Diamond State have cited no evidence that Illinois residents made reservations at the state entity-owned hotels or that any of those were advertised in Illinois.

In addition, it is well-settled that mere advertisement or solicitation of business is not enough to sustain personal jurisdiction in Illinois. *Riemer v. KSL Recreation Corp.*, 348 Ill. App. 3d 26, 36 (2004); *Kadala v. Cunard Lines, Ltd.*, 226 Ill. App. 3d 302, 310 (1992). In *Excel Energy Co., Inc. v. Pittman*, 239 Ill. App. 3d 160, 163 (1992), the court lacked personal jurisdiction over the defendant in a suit regarding defective oil field equipment, even though the plaintiff responded to the defendant's ad in a national magazine. More recently, in *Howard v. Missouri Bone and Joint Center, Inc.*, No. 5-05-0476 (April 24, 2007), the plaintiff alleged negligence in providing athletic training services in Missouri. The Fifth District found a lack of personal jurisdiction over the defendant even though the defendant had an interactive web site that allowed people to make appointments, fill out surveys, and ask questions. *Howard*, No. 5-05-0476, slip op. at 5. Here, the state entities' participation in national marketing and reservation

systems was insufficient for the trial court to exercise personal jurisdiction over them.

Relying on *Maunder v. DeHavilland Aircraft of Canada*, 102 Ill. 2d 342 (1984), Crum & Forster and Diamond State also claim that because ESA, Inc. created the state entities solely to facilitate refinancing of its mortgage debt and maximize its tax advantages, the ESA entities are attempting to shield themselves from Illinois' jurisdiction. In *Maunder*, a foreign corporation designed and manufactured airplanes, and its subsidiary, a Delaware corporation with its principal place of business in Illinois, sold and distributed parts for airplanes that the parent company manufactured. Victims of an airplane crash filed suit in Illinois against both the parent and subsidiary companies. Our supreme court held that the parent corporation was "doing business" in Illinois because it established a wholly owned subsidiary in Illinois to provide product support for the users of the parent company's products. *Maunder*, 102 Ill. 2d at 350. The subsidiary had been operating in Illinois as the parent's supply depot for 13 years, and these operations were continuous and systemic. *Maunder*, 102 Ill. 2d at 350. "We believe that a corporation that has established a supply depot in Illinois to support an enterprise that has sold 885 airplanes in the United States and logged millions of passenger miles should be subject to the jurisdiction of Illinois courts." *Maunder*, 102 Ill. 2d at 354.

In *Haubner*, relying on *Maunder*, we held that "it is appropriate to assert jurisdiction over a parent corporation if a subsidiary is acting as the parent corporation's Illinois agent in the sense of conducting the parent's business rather than its own." *Haubner,* 351 Ill. App. 3d at 122. *Maunder* relies on the fact that parents of wholly owned subsidiaries "necessarily control, direct, and supervise subsidiaries to some extent." *Haubner,* 351 Ill. App. 3d at 122. An Illinois court

may not assert jurisdiction over a parent company, however, if the subsidiary is conducting its own business. *Haubner,* 351 Ill. App. 3d at 122. This case is unlike *Haubner*, where the parent corporation was doing business in Illinois through "mere conduits."

*Maunder* is also the factual opposite of this case. While *Maunder* and *Haubner* found jurisdiction over the parent corporation proper based on the subsidiary doing business in Illinois, here, Crum & Forster and Diamond State claim that jurisdiction exists over the subsidiaries based on the parent's activities. They cite no authority for their proposed reverse-*Maunder* rule, which would find jurisdiction over the subsidiary based on the acts of the parent. In addition, there is nothing in the record indicating that the state entities failed to follow corporate formalities. The state entities are organized and exist as separate corporate and legal entities, and each state entity maintains its own separate books, files its own tax returns, and keeps separate financial statements.

### 3. *Due Process*

To satisfy federal due process requirements, a nonresident defendant must have sufficient minimum contacts with the forum state so that the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95, 102 (1945). In addition, federal due process requires that the action arise out of the defendant's contacts with the forum state and that it be reasonable to require the defendant to litigate in the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-77, 105 S. Ct. 2174, 2181-85, 85 L. Ed. 2d 528, 540-44 (1985).

Crum & Forster and Diamond State first contend that Illinois has an interest in providing

a forum for resolution of this dispute because Weather-Tite is an Illinois corporation. However, Weather-Tite and Transportation, the only Illinois citizens involved in the coverage action, settled with the ESA defendants and, therefore, are no longer parties to this dispute. In fact, there are no Illinois residents that have a current interest in this case. Furthermore, the hotels that the state entities own are located in Florida, Minnesota, Texas, Maryland, and Pennsylvania, not Illinois.

They also contend that due process is satisfied because the state entities, upon creation, had "fair warning" that the windows in their hotels might be defective and that they could be joined in a coverage action in states other than their domiciling states. Crum & Forster and Diamond State fail to show how knowledge that windows manufactured by a Missouri corporation were defective equates to "fair warning" that they would be brought into an insurance-coverage action in Illinois when none of the state entities owns property in Illinois. We further reject the argument that the state entities had "fair warning" of a law suit in Illinois because "they assigned their rights to the Lessee with respect to any alleged defects in their hotels." As the state entities correctly note, the portion of the operating lease giving the lessee "rights to proceed *** for breaches of warranties or representations or for latent defects in the Leased Property" contemplates the possibility that the lessee would pursue litigation as a plaintiff, not that they would be sued in a coverage action in Illinois.

Finally, Crum & Forster and Diamond State argue that requiring the state entities to litigate this dispute in Illinois would not be unduly burdensome because other ESA entities are subject to the jurisdiction of the Illinois court and are represented by the same counsel. Even

assuming that this factor weighs in favor of Crum & Forster and Diamond State, however, we still find that due process is not satisfied because, as explained above, minimum contacts do not exist.

## B. Doctrine of Representation

Crum & Forster and Diamond State argue that even if the trial court properly found that personal jurisdiction did not exist over the state entities, it erroneously dismissed their counterclaim because the remaining ESA defendants could adequately represent the interests of the state entities under the "doctrine of representation." The doctrine of representation would have allowed the trial court to retain jurisdiction over the remaining ESA entities, whose interests, according to Crum & Forster and Diamond State, were identical to those of the state entities.

Both the state entities and Crum & Forster and Diamond State agree that the state entities, as underlying claimants to the insurance policies, are necessary parties. See *M.F.A. Mutual Insurance Co. v. Cheek*, 66 Ill. 2d 492, 495 (1977); *Hapag-Lloyd (America), Inc. v. Home Insurance Co.*, 312 Ill. App. 3d 1087, 1094 (2000) (underlying claimants have a substantial interest in how insurance questions are resolved). A necessary party is one who has a legal or beneficial interest in the subject matter of the litigation and will be affected by the action of the court. *Holzer v. Motorola Lighting, Inc.*, 295 Ill. App. 3d 963, 970 (1998). *Holzer* enumerates three reasons to consider a party "necessary" such that a lawsuit should not proceed in his or her absence: (1) to protect an interest that the party has in the subject matter of the controversy that would be materially affected by a judgment entered in his or her absence, (2) to protect the

interests of those who are before the court, and (3) to enable the court to make a complete determination of the controversy. *Holzer*, 295 Ill. App. 3d at 970.

In *Oglesby v. Springfield Marine Bank*, 385 Ill. 414 (1944), our supreme court found that the necessary-party rule is:

"inflexible, yielding only when the allegations of the bill disclose a case so extraordinary and exceptional in character as that it is practically impossible to make all parties in interest parties to the suit, and further, the others are made parties who have the same interest as have those not brought in, and are equally certain to bring forward the entire merits of the controversy as would the absent persons."

*Oglesby*, 385 Ill. at 423-24. See also *Holzer*, 295 Ill. App. 3d at 979; *Bovinett v. Rollberg*, 73 Ill. App. 3d 490, 495 (1979); *Sullivan v. Merchants Property Insurance Co. of Indiana*, 68 Ill. App. 3d 260, 263 (1979). Therefore, *Oglesby* recognized an exception to the necessary-party rule, the "doctrine of representation," which consists of two elements: (1) the practical impossibility of joinder, and (2) others can adequately protect the interests of the absent party. *Oglesby*, 385 Ill. at 423-24.

The state entities claim that the "doctrine of representation," as articulated in *Oglesby*, is inapplicable for two reasons: (1) impossibility of joinder is not satisfied, and (2) adjudicating the action without the state entities would adversely affect their interests. Crum & Forster and Diamond State do not contend that it is "practically impossible" to join all claimants; rather, they contend that the doctrine articulated in *Oglesby* has "evolved to the extent that a showing of the

practical impossibility of joining all parties is no longer required for the doctrine to be applied."

Crum & Forster and Diamond State rely on *Yorulmazoglu v. Lake Forest Hospital*, 359 Ill. App. 3d 554 (2005), as evidence of the doctrine's evolution. In *Yorulmazoglu*, the plaintiff and two other claimants pursued claims against the defendant in an arbitration and also filed an action against the defendant in the circuit court of Lake County. The arbitrator found the defendant to be the prevailing party on most of the claims, so it awarded the defendant attorney fees. The plaintiff filed a petition in the Cook County circuit court to vacate the attorney-fee award granted by the arbitrator. The other two claimants, also represented by the plaintiff's counsel, filed a motion to confirm the final arbitration award in the Lake County action, which was granted. The Cook County action was then dismissed on the basis that the confirmation award entered in the Lake County action collaterally estopped the plaintiff from seeking to vacate the final award.

On appeal, the court determined that the plaintiff was not in privity with the other two claimants in the Lake County action for collateral estoppel purposes. *Yorulmazoglu*, 359 Ill. App. 3d at 561. In *dicta* contained in a footnote, which Crum & Forster and Diamond State rely on, the court noted that the rule requiring joinder of indispensable parties does not apply when a party, "though not before the court in person, is so represented by others that his interest receives actual and efficient protection." *Yorulmazoglu*, 359 Ill. App. 3d at 561, n. 4. However, the two claimants who sought to confirm the attorney fee award did not have the same interests as the plaintiff, who sought to vacate the award. *Yorulmazoglu*, 359 Ill. App. 3d at 561, n. 4.

Crum & Forster and Diamond State purport that this "application was recently

reaffirmed" in *Caparos v. Morton*, 364 Ill. App. 3d 159 (2006). In *Caparos*, the court found that 35 limited partners who filed a derivative suit against general partners for breach of fiduciary duty sought to protect the financial interests of all limited partners. *Caparos*, 364 Ill. App. 3d at 176. The limited partners did not suffer a distinct individual harm; rather, they sustained a common injury. *Caparos*, 364 Ill. App. 3d at 169. Therefore, the absent limited partners were not necessary parties in the action. *Caparos*, 364 Ill. App. 3d at 176. Similarly, in *Bill Marek's The Competitive Edge v. Mickelson Group*, 346 Ill. App. 3d 996, 1011 (2004), the court found that a company was not a necessary party because it had no interest in the subject matter of the litigation. The court proceeded to note that even if the company had an interest in the subject matter of the litigation, it was adequately represented because the funds identified in the plaintiff's complaint irrefutably belonged to either the plaintiff or the defendant and the proper party in interest "will possess the funds."

It is true that recent cases such as *Yorulmazoglu*, *Caparos*, and *Bill Marek's* do not discuss the impossibility of joinder requirement, nor do they cite *Oglesby* for such a rule. But see *Holzer*, 295 Ill. App. 3d at 979 ("Previous cases have also recognized that the rules requiring joinder may 'bend' when it is 'next to impossible to join all the parties indispensable to the litigation.' "). However, neither *Yorulmazoglu, Bill Marek's,* nor *Caparos* involved a situation where the trial court proceeded with a case after finding a lack of personal jurisdiction over necessary parties, the result that Crum & Forster and Diamond State contend would have been the correct one. Nor did they involve an insurance coverage declaratory action. More important, the passages that Crum & Forster and Diamond State cite constitute *obiter dicta*, remarks or

opinions uttered by the way, and are not binding authority. *Ko v. Eljer Industries, Inc.*, 287 Ill. App. 3d 35, 41 (1997). Accordingly, we find that Crum & Forster and Diamond State were required to satisfy the impossibility of joinder requirement articulated by *Oglesby*.

In a further attempt to avoid the impossibility of joinder requirement, Crum & Forster and Diamond State cast this case as a involving "a large number of necessary parties as often happens in mass tort litigation." They cite *Zurich Insurance Co. v. Baxter International, Inc.*, 275 Ill. App. 3d 30 (1995) (*Zurich I*), *affirmed as modified*, 173 Ill. 2d 235 (1996) (*Zurich II*), as representing that a showing of practical impossibility is no longer required, especially "in mass-tort and similar types of declaratory judgment litigation." We reject their suggested interpretation of *Zurich* for two reasons. First, the supreme court disavowed that portion of the appellate court opinion: "[T]he appellate court's discussion of necessary parties in mass-tort litigation cannot stand and is of no precedential value." *Zurich II*, 173 Ill. 2d at 243. Second, the Second District appellate court opinion, citing *Oglesby*, specifically held that "the necessary parties rule yields only when the two emphasized requirements are fulfilled." *Zurich I*, 275 Ill. App. 3d at 37. The court went on to find that due to the "extraordinary and exceptional character" of the case and the unity of interests between the 17 joined and 7,500 underlying claimants, joinder of all the underlying claimants was not required. *Zurich I*, 275 Ill. App. 3d at 41. Therefore, *Zurich I* actually underscores the vitality of the impossibility of joinder requirement. Furthermore, here, unlike a mass tort litigation involving a large number of parties, there is a definite and finite number of known claimants.

On appeal, Crum & Forster and Diamond State do not dispute the trial court's finding that

since this case involves a definite and finite number of claimants, it is not practically impossible to join all claimants. In their trial court pleadings, the insurers contended that if there was no personal jurisdiction over the state entities, then it is practically impossible to join all of the parties in any state. To the contrary, Missouri is an alternative forum, as Quaker, the window manufacturer, is a Missouri company and the state entities contend that the insurance contracts were issued in Missouri. Indeed, the settlement agreement between ESA and Quaker is based on the Missouri "reach and apply" statute, and the ESA entities have sought to enforce their rights under the agreement by filing such an action in Missouri.

As for the second factor, Crum & Forster and Diamond State argue that the ESA entities over which the trial court had jurisdiction could have fully represented the state entities' interests in the coverage action. Specifically, they contend, the state entities are beneficiaries of the national account contract that ESA, Inc. negotiated with Weather-Tite and of the litigation undertaken by Extended Stay, Inc. against Quaker. For example, the ESA entities not challenging jurisdiction brought a unified complaint in the U.S. District Court for the Central District of California. All of the ESA entities share "the similar goal of recouping damages sufficient to repair the hotel properties for the alleged damages caused by Quaker windows."

In addition, Crum & Forster and Diamond State point out that the state entities are wholly owned subsidiaries of ESA. They claim that the state entities and the other ESA entities would be equally impacted by any rulings on each coverage defense, since Transportation's complaint and Diamond State and Crum & Forster's counterclaims did not distinguish among the entities. In addition, they cite the lease agreement and management and operating contracts as

-19-

demonstrating privity between the state entities and the ESA entities that have not contested jurisdiction.

The state entities, citing *Flashner Medical Partnership v. Marketing Management*, *Inc.*, 189 Ill. App. 3d 45 (1989), respond that the "identical interest" analysis has never been applied in insurance coverage actions. In *Flashner*, a medical group brought a declaratory coverage action against its medical-malpractice insurers, insurance brokers, and insurance-program developers. It also alleged that the insurers engaged in fraud and negligent misrepresentation and that the brokers and developers committed fraud, negligence, negligent misrepresentation, breach of contract, and a violation of the Illinois Insurance Code. On appeal, the court found that the tort claimants in the underlying suits, who were not named in the suit, were necessary parties to the action because a declaration of noncoverage would eliminate a source of funds. *Flashner*, 189 Ill. App. 3d at 53-54. It rejected the medical group's contention that the tort claimants were adequately represented by parties before the court: "Plaintiffs cite no cases, nor have we found any, applying the doctrine to tort claimants in a declaratory judgment action to determine liability insurance coverage." *Flashner*, 189 Ill. App. 3d at 54. Further, although the tort claimants and the insured had similar interests in a determination of coverage under the policy, the success of the insured's claims against the other defendants might depend upon a determination of noncoverage. *Flashner*, 189 Ill. App. 3d at 54. The insureds, "therefore, might choose to pursue a litigation strategy that could adversely affect the absent tort claimants." *Flashner*, 189 Ill. App. 3d at 54.

There are important distinctions between the case at bar and *Flashner*. For example, in

*Flashner*, no underlying claimant was made a party, while in the instant case, other ESA entities, in addition to the state entities, were underlying claimants. Furthermore, the other ESA entities, the state entities' fellow claimants, have a similar interest in the outcome of the litigation, unlike the insured, whose interests may not be sufficiently aligned with an underlying claimant to represent its interests. Therefore, under these circumstances, the fact that this is a declaratory action does not preclude the application of the "identical interest" analysis.

Nevertheless, we find that proceeding with this case could adversely affect the state entities' interests. The state entities have filed a suit in Missouri against Crum & Forster, Diamond State, and American Automobile for the settlement amount that was not fully funded by proceeds from the settling insurer policies. Proceeding with this coverage case could lead to inconsistent judgments and would also encourage piecemeal litigation. Furthermore, as we explained above, Illinois' interest in Crum & Forster and Diamond State's complaint and counterclaim is minimal at best.

## III. CONCLUSION

For the foregoing reasons, we affirm the dismissal of Crum & Forster and Diamond State's counterclaims.

Affirmed.

QUINN, P.J., and NEVILLE, J., concur.