NO. 4-07-0345     Filed 1/29/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE ESTATE OF LEE R. ISRINGHAUSEN, by | ) | Appeal from |
| SUSAN ISRINGHAUSEN, Executrix, | ) | Circuit Court of |
|      Plaintiff-Appellant, | ) | Sangamon County |
|      v. | ) | No. 06LM1235 |
| PRIME CONTRACTORS AND ASSOCIATES, | ) | |
| INC., d/b/a APM CUSTOM HOMES, | ) | Honorable |
|      Defendant-Appellee. | ) | Roger W. Holmes, |
| | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

Prior to Lee R. Isringhausen's death, he had entered into a contract with APM Custom Homes (APM), a Florida corporation, to build a custom home in Marco Island, Florida. Lee provided APM with a $100,000 deposit. Although APM returned some of the deposit following Lee's death, APM retained $42,500 for its construction-management fee. Susan Isringhausen, as the executrix of Lee's estate, filed a breach-of-contract claim against APM for the sum of $42,500. The trial court dismissed Susan's complaint for lack of personal jurisdiction. Susan appeals. We affirm.

I. BACKGROUND

A. Correspondence Between the Parties

Lee Isringhausen was a resident of Sangamon County, Illinois. APM is a Florida corporation. According to the affidavit of APM's president, Todd Schneider, Lee Isringhausen owned several properties in Marco Island and was interested in further development. Dan Wilmath had been Isringhausen's long-

time realtor in Marco Island and helped Isringhausen purchase the land at 1460 Salvadore Court, where the residence at issue in this case was to be built.  Wilmath also served as Isringhausen's property manager and groundskeeper.  After three years as Isringhausen's realtor, Wilmath gained employment with APM.  During the time in question, Wilmath was working both as Isringhausen's realtor and also for APM.  Wilmath put Isringhausen in contact with APM.  Isringhausen then met with Schneider for the first time in Marco Island, Florida, at one of APM's model homes to discuss the possibility of constructing a residence.

According to the affidavit of Lee's attorney, Almon Manson, on November 21, 2005, and December 1, 2005, Wilmath, acting on behalf of APM, forwarded from Florida to Isringhausen's Springfield office several documents, information, and blueprints regarding the proposed construction at 1460 Salvadore Court.  On December 12, 2005, APM president Schneider contacted Isringhausen by telephone at Isringhausen's Springfield, Illinois, office.  Schneider told Isringhausen that he would deliver via facsimile the contract for the construction of the custom home.  Isringhausen conferred with Manson on the terms of the contract.  On December 19, 2005, Isringhausen signed the contract and returned it to Schneider.  Additionally, as evidenced by a document prepared by APM entitled "Isringhausen Accounting," which APM attached to its motion to dismiss, APM sent correspon- dence to Isringhausen in Springfield on four other occasions:

November 29, 2005, December 6, 2005, January 10, 2006, and January 17, 2006.

The facts regarding the parties' correspondence and contract formation are slightly different according to Schneider's affidavit. Schneider attests that all discussions relative to the construction of the custom home took place in Marco Island, Florida. Schneider states he never spoke with Isringhausen over the phone. APM delivered the contract to Isringhausen in Marco Island, Florida. Schneider had no knowledge of the documents, information, and blueprints allegedly forwarded by Wilmath. Schneider attested that APM had nothing to do with the blueprints. Rather, the blueprints were from Isringhausen's Florida architect, WHJ Architects and Associates (WHJ). Wilmath sent Isringhausen the blueprints in the capacity of Isringhausen's realtor and independent contractor. Wilmath sought out and orchestrated Isringhausen's relationships with both WHJ and APM.

B. Terms of the Contract and the Underlying Lawsuit

The terms of the contract state that "the [c]ontract shall be governed by the law of the place where the project is located." In addition to the choice-of-law provision, the contract also included a payment schedule as an attachment. The ultimate cost of the home was to be $1,942,588. Upon execution of the contract and prior to the start of work, Isringhausen was to pay $97,129.40 (referred to by the parties as the $100,000 deposit). Upon issuance of a building permit, Isringhausen was

- 3 -

to pay another $97,129.40. Upon completion of the foundation work, Isringhausen was to pay another $291,388.20, and so on. There were nine payments scheduled in all. However, Isringhausen passed away after making the initial $100,000 deposit and the project came to a halt.

On April 7, 2006, APM sent attorney Manson a refund check in the amount of $23,855.61. APM contends $23,855.61 is the amount due from Isringhausen's initial deposit of $100,000. According to the "Isringhausen Accounting" document, APM kept $42,500 as a construction-management fee, $19,135 for payments to WHJ architects, $2,500 for payments made to a lumber company, and several thousand dollars on a series of smaller expenses, including the shipment of the aforementioned blueprints. It is unclear whether this was an expense incurred by APM, Wilmath, or WHJ. Susan, as executrix of Lee's estate, disputes only the $42,500 construction-management fee. As stated in attachments to the contract, the total projected cost over the scope of the project for construction management was going to be $170,000. APM estimated that, for the three months it apparently proceeded with the project, the construction-management fee should be $42,500.

On July 6, 2006, Susan filed a complaint against APM in Sangamon County circuit court, apparently alleging breach of contract. Susan argued that a valid contract existed between APM and Isringhausen and that Isringhausen performed all of his duties under the contract. Susan further argued that construction ceased and the contract was terminated in January 2006, upon

Lee's passing. Susan contends that nothing in the nine-step payment schedule, which was based on services completed, indicated that APM was due $42,500 for construction-management services. Susan requests damages in the amount of $42,500.

On July 31, 2006, APM filed a motion to dismiss for lack of personal jurisdiction. APM argued that Illinois courts lacked both general and specific jurisdiction over it. On February 27, 2007, Susan filed a response to APM's motion to dismiss. Susan argued that Illinois had specific jurisdiction over APM under sections 209(a)(7) and 2-209(c) of the Code of Civil Procedure (735 ILCS 5/2-209(a)(7), 2-209(c) (West 2004), that is, the Illinois long-arm statute (735 ILCS 5/2-209 (West 2004)).

On March 22, 2007, the trial court entered a written memorandum of opinion, granting APM's motion to dismiss for lack of personal jurisdiction. The trial court stated that the issue was whether "[APM] has sufficient minimum contacts with [Illinois] to require [APM] to defend itself in Sangamon County, Illinois." The trial court quoted an excerpt from Roiser v. Cascade Mountain, Inc., 367 Ill. App. 3d 559, 855 N.E.2d 243 (2006), which discussed the standard for establishing general jurisdiction over the person. Immediately following the excerpt, the court then stated that performance on the subject of the contract for the construction of a home in Florida was not "substantially connected" to the State of Illinois, a phrase typically used in reference to specific jurisdiction under the

- 5 -

long-arm statute.  735 ILCS 5/2-209(a)(7) (West 2004).  This appeal followed.  APM did not file a brief on appeal.

## II. ANALYSIS

Susan appeals the trial court's dismissal of her complaint for lack of personal jurisdiction.  When the trial court decides the issue of personal jurisdiction solely on the basis of documentary evidence, as it did here, we review the trial court's dismissal for lack of personal jurisdiction de novo.  Roiser, 367 Ill. App. 3d at 561, 855 N.E.2d at 247.  The plaintiff has the burden of establishing a prima facie case for jurisdiction over the nonresident defendant.  Roiser, 367 Ill. App. 3d at 561, 855 N.E.2d at 247.  Conflicts between the parties' affidavits will be resolved in favor of the plaintiff for the purposes of establishing a prima facie case for personal jurisdiction over the defendant.  Kalata v. Healy, 312 Ill. App. 3d 761, 765, 728 N.E.2d 648, 652 (2000).

Personal jurisdiction may be specific or general.  If the lawsuit "arises out of or is connected to the defendant's purportedly wrongful activities within the forum state," Illinois courts may potentially assert specific jurisdiction over a nonresident defendant.  Roiser, 367 Ill. App. 3d at 562, 855 N.E.2d at 247.  "'"The focus is on the defendant's activities within the forum state, and not on those of the plaintiff."'" Bolger v. Nautica International, Inc., 369 Ill. App. 3d 947, 952, 861 N.E.2d 666, 672 (2007), quoting Campbell v. Mills, 262 Ill. App. 3d 624, 627, 634 N.E.2d 41, 44 (1994), quoting Sackett

<u>Enterprises, Inc. v. Staren</u>, 211 Ill. App. 3d 997, 1004, 570
N.E.2d 702, 706 (1991).

If the underlying lawsuit or claim does not "arise out
of or relate to a defendant's activities" in Illinois, the trial
court is limited to determining whether it has general jurisdic-
tion over the nonresident defendant. <u>Roiser</u>, 367 Ill. App. 3d at
562, 855 N.E.2d at 247-48.  Section 2-209(b), which addresses
general jurisdiction under the long-arm statute, states that an
Illinois court may exercise jurisdiction over <u>any</u> action (as
opposed to an action "arising out of" the nonresident defendant's
activities in Illinois) if the nonresident defendant is a (1)
natural person present in Illinois when served; (2) natural
person domiciled or resident in Illinois when the cause of action
arose, the action commenced, or process was served; (3) corpora-
tion organized under the laws of Illinois; or (4) a natural
person or a corporation doing business within Illinois.  735 ILCS
5/2-209(b) (West 2004).  The trial court quoted the "doing
business" standard extensively in its written memorandum of
opinion.  The "doing business" standard is quite high.  <u>Roiser</u>,
367 Ill. App. 3d at 562, 855 N.E.2d at 248.  The nonresident
defendant must have "continuous and systematic" business contacts
with Illinois.  <u>Roiser</u>, 367 Ill. App. 3d at 562, 855 N.E.2d at
248.  The nonresident must conduct business in Illinois "'"not
occasionally or casually, but with a fair measure of permanence
and continuity."'  [Citations.]"  <u>Roiser</u>, 367 Ill. App. 3d at
562, 855 N.E.2d at 248.  The nonresident corporation has in

- 7 -

effect taken up residence in Illinois and therefore may be sued on causes of action both related and unrelated to its activities in Illinois. Roiser, 367 Ill. App. 3d at 563, 855 N.E.2d at 248.

Susan argues that the trial court erred in applying the higher general jurisdiction standard to the instant case, i.e., "continuous and systematic business contacts," and in failing to evaluate whether Illinois had specific jurisdiction over APM. Susan concedes that Illinois does not have general jurisdiction over APM but contends that Illinois does have specific jurisdiction over APM under sections 2-209(a)(7) and 2-209(c) of the Illinois long-arm statute. Section 2-209(a)(7) states that jurisdiction over a nonresident defendant is proper in causes of action arising from "the making or performance" of a contract that is "substantially connected" to Illinois. 735 ILCS 5/2-209(a)(7) (West 2004). Section 2-209(c) is known as the catchall provision of the long-arm statute and states that "[a] court may also exercise jurisdiction on any *** basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c) (West 2004).

We agree with Susan that the trial court's citations to general-jurisdiction precedent and the "doing business" standard set forth in Roiser are inapplicable to the issue of specific jurisdiction. However, we must make our determination of jurisdiction based on a de novo review of the documents on record. See Rosier, 367 Ill. App. 3d at 561, 855 N.E.2d at 247. Therefore, any apparent failure on the part of the trial court to

- 8 -

consider the question of specific jurisdiction in its written memorandum of opinion does not mandate a reversal. Rather, we must take it upon ourselves to examine the question of specific jurisdiction.

In determining whether jurisdiction is proper over a nonresident defendant, we must evaluate the following: (1) whether jurisdiction is proper under the specific language of the long-arm statute; and (2) whether jurisdiction is permissible under the notions of due process. Illinois Commerce Comm'n v. Entergy-Koch Trading, LP, 362 Ill. App. 3d 790, 796, 841 N.E.2d 27, 33 (2005), citing Rollins v. Elwood, 141 Ill. 2d 244, 271, 565 N.E.2d 1302, 1314 (1990). An exercise of personal jurisdiction under the provisions of the long-arm statute (in this case sections 2-209(a)(7) and 2-209(c)) must comport with the due-process clause of the United States Constitution. Commercial Coin Laundry Systems v. Loon Investments, LLC, 375 Ill. App. 3d 26, 29-30, 871 N.E.2d 898, 901 (2007).

To exercise jurisdiction, due process requires that the defendant has "certain minimum contacts with [the state] such that *** maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Citation.]" International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158 (1945). To satisfy the minimum-contacts standard, there must be some act by which the defendant purposefully availed himself of the privilege of conducting business in the forum state, in order to assure that a nonresi-

dent will not be called into a forum solely as a result of random, fortuitous, or attenuated contacts with the forum or the unilateral acts of a consumer or some other third person. Roiser, 367 Ill. App. 3d at 562, 855 N.E.2d at 247, citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 542, 105 S. Ct. 2174, 2183 (1985). In determining whether the federal due-process standard has been satisfied so as to warrant Illinois jurisdiction, we consider whether (1) the nonresident defendant had "minimum contact" with Illinois such that there was "fair warning" that the nonresident defendant may be haled into an Illinois court; (2) the action arose out of or related to the defendant's contacts with Illinois; and (3) it is reasonable to require the defendant to litigate in Illinois. Ores v. Kennedy, 218 Ill. App. 3d 866, 872, 578 N.E.2d 1139, 1144 (1991). The defendant should be able to anticipate or foresee being called into an Illinois court. Burger King, 471 U.S. at 474, 85 L. Ed. 2d at 542, 105 S. Ct. at 2183.

As stated above, Susan argues that jurisdiction is proper under section 2-209(a)(7) of the long-arm statute, regarding the making or performance of a contract that is substantially connected to Illinois. However, a nonresident's contract with an Illinois resident does not necessarily establish the minimum contacts required by the principles of due process. Nautica International, 369 Ill. App. 3d at 952, 861 N.E.2d at 671. In determining whether the defendant sufficiently availed itself of the benefits of Illinois law in forming the contract with the

Illinois resident, the court should consider the following: (1) who initiated the transaction; (2) where the contract was negotiated; (3) where the contract was formed; and (4) where performance of the contract was to take place. Nautica International, 369 Ill. App. 3d at 952, 861 N.E.2d at 671, citing Viktron Ltd. Partnership v. Program Data, Inc., 326 Ill. App. 3d 111, 117-18, 759 N.E.2d 186, 193-94 (2001). Additionally, a choice-of-law provision in the contract is a relevant, though not a determinant, factor in establishing jurisdiction. Nautica International, 369 Ill. App. 3d at 952, 861 N.E.2d at 671. Presumably, the choice-of-law provision is relevant because foreseeability on the defendant's part is central to the determination of whether personal jurisdiction would be reasonable and fair under the circumstances. See Burger King, 471 U.S. at 474, 85 L. Ed. 2d at 542, 105 S. Ct. at 2183.

In Nautica International, a third-party yacht manufacturer put plaintiff Bolger, an Illinois resident, in contact with defendant Nautica International (Nautica), a Florida corporation that manufactured custom inflatable boats suitable for use on yachts. Nautica International, 369 Ill. App. 3d at 948, 861 N.E.2d at 668. Bolger told Nautica that he would be traveling to Florida to see examples of Nautica's boats at an upcoming boat show. Nautica then e-mailed price quotes to Bolger's office in Illinois. Upon returning from the boat show in Florida, Bolger sent a fax to Nautica inquiring about shipping options. Nautica sent a return fax addressing Bolger's questions. Bolger signed

- 11 -

Nautica's price quote and faxed it from Illinois to Florida. Nautica then mailed a copy of the contract with all its terms to Bolger at his home in Illinois. The contract stated: "[t]his agreement shall be deemed executed in Miami-Dade County, Florida[,] and shall be construed and interpreted according to the laws of the State of Florida." Nautica International, 369 Ill. App. 3d at 947, 861 N.E.2d at 668. Bolger later terminated the purchase of the boat because it allegedly failed to meet his size and weight specifications, making it unsuitable for installation on his yacht. The parties communicated via e-mail and fax for several months, attempting to come to a resolution, but Bolger ultimately filed a breach-of-contract claim. Nautica International, 369 Ill. App. 3d at 948-49, 861 N.E.2d at 667-68.

Nautica moved to dismiss for lack of personal jurisdiction. Nautica International, 369 Ill. App. 3d at 949, 861 N.E.2d at 668. Bolger argued at the trial court and on appeal that Illinois courts had jurisdiction over Nautica because Nautica entered into a contract with a known Illinois resident and sent numerous pieces of correspondence to Illinois. The court held this was not enough to establish specific jurisdiction. Nautica International, 369 Ill. App. 3d at 954, 861 N.E.2d at 672. In its due-process analysis, the court reasoned that, despite the various communications sent by both parties between Illinois and Florida, Nautica did not "reach into Illinois and purposefully avail itself of the benefits and protections of its laws." Nautica International, 369 Ill. App. 3d at 954, 861 N.E.2d at

- 12 -

672. Bolger initiated the purchase of the boat, traveled to the Florida boat show in furtherance of making a purchase, and chose to enter into a contract with a Florida choice-of-law provision. Nautica International, 369 Ill. App. 3d at 954, 861 N.E.2d at 672. Further, the contract contemplated performance in Florida, Nautica International did not maintain a physical presence in Illinois, and the contract did not contemplate it would ever do so. Nautica International, 369 Ill. App. 3d at 954, 861 N.E.2d at 672.

The circumstances in the instant case are nearly identical to those in Nautica International. Isringhausen was put into contact with APM through a third party, Dan Wilmath. Isringhausen went down to Florida to examine one of APM's model homes and initiated negotiations for the purchase of the custom home. According to Isringhausen, the parties then proceeded to communicate telephonically, through fax, and through mail between Illinois and Florida. APM sent Isringhausen a copy of the contract to sign, just as Nautica International sent Bolger a copy of the contract to sign. Isringhausen signed and returned the contract, which contained a choice-of-law provision that stated: "the [c]ontract shall be governed by the law of the place where the project is located." The contract contemplated perfor- mance (i.e., building the home) in Florida. APM never had a physical presence in Illinois, nor did the contract contemplate one. For all of these reasons, we find that APM did not purpose- fully avail itself to the benefit of Illinois law such that it

- 13 -

could reasonably anticipate being haled to court in Illinois.

Though our above reasoning is dispositive, we take time to distinguish some of the cases cited by Susan. Susan cited two cases in support of her argument that the court should exercise specific jurisdiction under section 2-209(a)(7): Kalata, 312 Ill. App. 3d 761, 728 N.E.2d 648, and Celozzi v. Boot, No. 00 C 3285 (N.D. Ill. August 11, 2000) (2000 WL 1141568) (not reported in F. Supp. 2d). In Kalata, the court held that the existence of an oral contract and the exchange of funds between parties, formed as a result of negotiations over the phone between a party residing in California and a party residing in Illinois, was sufficient to create a prima facie case that there existed a contract substantially connected to Illinois to establish personal jurisdiction under section 2-209(a)(7). Kalata, 312 Ill. App. 3d at 766, 728 N.E.2d at 652-53 (involving an oral agreement to enter into a joint venture to purchase real estate, the terms of which involved the Illinois resident's placement of funds into a joint account in California). Similarly, in Celozzi, the court held that the requirements for asserting jurisdiction in Illinois were satisfied under section 2-209(a)(7) of the Illinois long-arm statute because the breached agreement had been formed as a result of negotiations over the phone between Illinois and California, as well as negotiations that took place in California. Celozzi, slip op. at 3 (involving a contract for a California corporation's production and distribution of an Illinois corporation's film). The instant case is similar to Kalata and

- 14 -

Celozzi in that it too involved negotiations and correspondence between an Illinois resident and a nonresident defendant that culminated in a contract.

However, unlike APM, the nonresident defendants in Kalata and Celozzi should have anticipated being haled to court in Illinois. For one, the contracts in Kalata and Celozzi did not involve a choice-of-law provision specifying a jurisdiction other than Illinois. Moreover, in Kalata, the nonresident defendant specifically sought out the Illinois plaintiff for participation in a joint endeavor and later dissipated all funds in the joint account. Kalata, 312 Ill. App. 3d at 763, 728 N.E.2d at 651. Illinois would have a strong interest in adjudicating a dispute where an Illinois resident was specifically targeted and allegedly victimized, as compared to the situation in our case where APM did not seek out and target Isringhausen. See Illinois Commerce, 362 Ill. App. 3d at 800, 841 N.E.2d at 36 (indicating Illinois' interest in adjudicating the dispute as a factor in a due-process analysis).

In Celozzi, the court found it "most revealing" that the California corporation asked the Illinois corporation to establish a bank account in Illinois, over which both corporations would maintain some control, for the receipt and disbursement of funds for the movie. Celozzi, slip op. at 4. In our case, money may have been wired from Illinois, but it is not as though Isringhausen and APM shared a joint account in Illinois. Finally, the contract in Celozzi contemplated distribution of the

movie in Illinois, whereas, in our case, all of the performance on the contract was to be in Florida.  <u>Celozzi</u>, slip op. at 2.

In sum, despite the formation of a contract between Isringhausen and APM, APM did not have sufficient minimum contacts with Illinois such that it could reasonably anticipate being hailed into an Illinois court.  Personal jurisdiction over APM would not comport with the principles of due process.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

McCULLOUGH and STEIGMANN, JJ., concur.