2022 IL App (1st) 200823-U

THIRD DIVISION
August 17, 2022

No. 1-20-0823

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| HUMILIS, LLC, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | 16 L 66070 |
| WRIGHT TREE SERVICE INC., a Domestic Corporation, | ) | |
| | ) | Honorable |
| | ) | Thomas J. Condon |
| Defendant-Appellant. | ) | Judge Presiding |
| | ) | |

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgement.

**ORDER**

¶ 1    *Held*: Reversed and remanded with instructions. Court erred in denying 2-1401 petition challenging default judgment as void for lack of personal jurisdiction. Remanded with instructions to vacate default judgment and dismiss case for lack of personal jurisdiction.

¶ 2    Wright Tree Service Inc. (WTS) appeals from the court's denial of its Section 2-1401 petition, which challenged a default judgment that plaintiff, Humilis, LLC obtained. WTS's petition challenged the judgment as void, as it was not subject to either general or specific personal jurisdiction within Illinois.

¶ 3    Without conducting an evidentiary hearing, the court concluded that "That there was enough contacts between Wright Tree Service, Inc and Plaintiff Humilis LLC to support

jurisdiction under the Illinois Long Arm statute." For the following reasons, we reverse and remand with instructions.

¶ 4                                              BACKGROUND

¶ 5     WTS is an Iowa corporation that performs tree-cutting services in more than 40 states, including Illinois. Humilis is an Illinois limited liability company that owns property in Benton Harbor, Michigan. In the summer of 2016, WTS performed tree-cutting work for the holder of an easement on Humilis's Benton Harbor property. WTS tells us the easement holder is American Electric Power, presumably with an easement to run power lines or something of that nature. Humilis does not dispute as much, but neither the identity of the easement holder nor the scope of the easement is of consequence. The important points are that WTS contracted with and performed this work for the easement holder; Humilis alleges that WTS left the easement in poor condition post-work; and Humilis alleges that WTS promised Humilis that it would return the property to good condition post-work but did not.

¶ 6     In December 2016, Humilis filed a two-count lawsuit in the circuit court of Cook County against WTS, claiming that WTS left the easement property in poor condition after the tree-cutting work and did not remediate the damage. The lawsuit alleged (incorrectly) that WTS was a "domestic corporation."

¶ 7     In count 1 of Humilis's complaint against WTS, sounding in "negligence," Humilis alleges that it "allowed" WTS to perform the tree-cutting work on the easement "with the understanding and promise to return the Premises to a condition that was substantially the same as it was prior to [WTS's] entry onto said Premises." Count 1 alleges that WTS left the property damaged and did not repair that damage.

¶ 8    Count 2 is labeled "breach of oral contract." In that count, Humilis re-alleges that WTS performed the work and left the easement property in damaged condition. Count 2 adds that, "on or about August 21, 2016 and several times thereafter, [WTS] orally promised [Humilis] to return the premises to the same or substantially the same condition." Count 2 then alleges that WTS did not keep that promise, leaving the property in disrepair.

¶ 9    After service of process, the court entered a default judgment against WTS in March 2017. However, shortly thereafter, in April, a different judge ordered that "default judgment order entered on 3/1/17 is vacated on question of jurisdiction. Plaintiff to advise court on proper jurisdiction of case + bring a new mtn for default."

¶ 10    As of January 2018, there had been no substantive activity on the case and the circuit court dismissed it for want of prosecution. That August, a third judge vacated "the DWP entered on 1/16/18." Between April 2017 and August 2018, there is no indication in the record that Humilis provided the proof requested by the court in April 2017. Nonetheless, the August order also reinstated the default against WTS and set the matter for prove-up.

¶ 11    Finally, in May 2019, a fourth judge (the judge under review), issued the following order: "based upon sworn testimony and evidence presented in open court, judgement is hereby entered in favor of Humilis LLC and against Defendant Wright Tree Service, A Domestic Corporation in the amount of $250,000.00."

¶ 12    Based on this default judgment, Humilis issued a citation to discover assets in November 2019. Less than two weeks after the citation issued, WTS's counsel entered a limited appearance for the purpose of contesting personal jurisdiction. Contemporaneous with this appearance, WTS filed a petition pursuant to section 2-1401 of the Code of Civil Procedure, challenging the default judgment as void for lack of personal jurisdiction. See 735 ILCS 5/2-1401 (West 2018).

¶ 13    In support of the petition, WTS filed the affidavit of its general counsel, Austin Kennedy. In it, Kennedy swore that WTS is an Iowa corporation that does business in 40 states. It has 4200 employees and does more than $350 million in business annually. Of that, 300 employees (7%) are located in Illinois, and approximately $31 million in revenue (8.85%) comes from Illinois. The company also owns a single property in Bartonville, IL. Despite Humilis referring to WTS in its complaint as a domestic corporation, "Wright Tree Service, Inc. is not currently and never has been registered as an Illinois domestic corporation with the Illinois Secretary of State. Wright Tree Service, Inc. has never held itself out to be an Illinois domestic corporation."

¶ 14    The court ordered briefing. In response, Humilis provided the affidavit of Steven Armbruster, an attorney with Vrdolyak Law Group, LLC, who negotiated the "oral contract" with WTS. Armbruster claimed that he spoke with "a representative of [WTS], several times between January and August 2016." In those calls, the representative "made a series of promises concerning property owned by [Humilis], an Illinois limited liability company." "During each of those conversations, I was in Illinois. I did not represent to [WTS] that I was anywhere else, and the phone number I used reflected an Illinois area code. Additionally, there were numerous times that I left voicemails indicating that I was calling from The Vrdolyak's office in Chicago."

¶ 15    After supplemental briefing, the court held oral arguments on the petition in June 2020. During oral argument, Humilis submitted three additional documents for the court's review, which are included in the supplemental record. One was a letter from August 2019, merely informing WTS of the default judgment and enclosing a copy of the judgment.

¶ 16    A second document was a letter dated August 3, 2016, sent from Mr. Armbruster of the Vrdolyak Law Group to WTS's corporate headquarters on Grand Avenue in West Des Moines, Iowa, as well as to a P.O. box in West Des Moines. (The letter is not addressed to a specific

individual, but merely to WTS generally.) In that letter, Mr. Armbruster noted that WTS had recently "performed various services on property located" in Benton Harbor, and that WTS had "assured the property owners that the premises would be left in the same condition it was found," but "[i]t was not." In the letter, Mr. Armbruster writes: "I have had multiple conversations with Eric Davidson from [WTS] about this problem. Initially, he indicated that [WTS] would correct any problems, but then declined to do so." Mr. Armbruster then threatens legal action against WTS if WTS failed to remediate the property.

¶ 17     The final document submitted for the first time at the oral argument hearing was a letter dated a few months later—October 5, 2016. The letterhead, again, is the Vrdolyak Law Group, and it is again signed by Mr. Armbruster from that law firm. The letter is addressed to a "Mr. Dillon," but there is no address block at the beginning of the letter that would indicate who Mr. Dillon is, for whom Mr. Dillon works, or where the letter was being sent. Literally, the first line below the letterhead states the date, and the next line reads, "Dear Mr. Dillon." (We would expect, though we cannot know with certainty, that the letter was written to Brandon Dillon, a WTS employee who was the project manager on the tree-cutting work performed on the easement in Michigan.)

¶ 18     In any event, that letter indicates that Mr. Armbruster had engaged in discussions with Mr. Dillon and, by this letter, was enclosing photographs of the damage caused by WTS to the property. (The photographs were not submitted to the court.) And Mr. Armbruster again threatens legal action if WTS does not remediate the damage to the property.

¶ 19     During this oral argument, the court did not hear any substantive testimony. No live witnesses were called. The court simply heard legal argument from the parties, along with the reference to the three additional documents that the court later made part of the record. The court

took the matter under advisement and later issued a brief written order indicating that it had "considered the parties' written briefs and heard argument." The court entered an order finding "[t]hat there was enough contacts between Wright Tree Service, Inc and Plaintiff Humilis LLC to support jurisdiction under the Illinois Long Arm statute, and as such, Wright Tree Service, Inc's Petition for Relief Pursuant to 735 ILCS 5/2-1401 is DENIED." WTS timely appealed.

¶ 20                                    ANALYSIS

¶ 21    Initially, Humilis claimed the record was inadequate for us to review the issues presented by this appeal, as WTS failed to include the transcript of the June 2020 hearing. In its reply brief, WTS recognized the transcript was missing and indicated that it was taking steps to supplement the record. After a few stumbles that spanned more than seven months, WTS finally properly submitted the supplemental record for our review in late March 2022. Now that we have the transcript from the June 2020 hearing and the three additional documents submitted by Humilis at that hearing, Humilis's claim is moot. On to the merits.

¶ 22    WTS argues that the court erred in denying its section 2-1401 petition, as the court lacked either general or specific jurisdiction over WTS.

¶ 23    A party may challenge a default judgment as void for lack of jurisdiction at any time by filing a Section 2-1401 petition. *Sarkissian v. Board of Education*, 201 Ill. 2d 95, 103 (2002). Humilis concedes that, as the plaintiff, it has the burden to establish "a *prima facie* basis to exercise personal jurisdiction over a nonresident defendant." *Aspen American Insurance Company v. Interstate Warehousing, Inc.*, 2017 IL 121281, ¶ 12. This is true even though the question of personal jurisdiction was raised by WTS, the defendant, in a section 2-1401 petition. See *R.W. Sawant & Co. v. Allied Programs Corp.*, 111 Ill. 2d 304, 310 (1986); *Graver v. Pinecrest Volunteer Fire Dept.,* 2014 IL App (1st) 123006, ¶ 13.

¶ 24    In deciding this question of jurisdiction, the court must look to "the uncontroverted pleadings, documents and affidavits, as well as any facts asserted by the defendant that have not been contradicted by the plaintiff." *Cardenas Marketing Network, Inc v. Pabon*, 2012 IL App (1st) 111645, ¶ 28. If the plaintiff meets its initial burden, but the evidence shows a question of material fact, the court must conduct a hearing to resolve the issue. *Id*.

¶ 25    Here, the court found an evidentiary hearing unnecessary and resolved the issue on the papers. When reviewing documentary evidence, "any conflicts in the pleadings and supporting affidavits will be resolved in the plaintiff's favor, but uncontradicted evidence offered by the defendant may defeat jurisdiction." *Aspen*, 2017 IL 121281, ¶ 12. "Where, as here, the circuit court has determined that the plaintiff has met its burden based solely on documentary evidence, our review is *de novo*." *Id*.; see also *Graver,* 2014 IL App (1st) 123006, ¶ 13.

¶ 26    There are two ways in which our courts exercise personal jurisdiction over a defendant: general and specific jurisdiction. *Rios v. Bayer Corporation*, 2020 IL 125020, ¶ 19. Illinois law substantially mirrors federal law on the issue of personal jurisdiction. See *Russell v. SNFA*, 2013 IL 113909, ¶ 32. Our supreme court has left open the possibility that a " 'rare (and perhaps hypothetical) case' " might cause our case law to diverge. *Id.* (quoting *GMAC Real Estate, LLC v. E.L. Cutler & Associates, Inc.*, 472 F. Supp. 2d 960, 964 (N.D. Ill. 2006)). But WTS does not contend that this is that special case, so jurisdiction need only meet the federal standard. See *Rios*, 2020 IL 125020, ¶ 17.

¶ 27    It is not entirely clear whether the trial court found general jurisdiction over WTS or specific jurisdiction; the court merely identified the "long-arm statute," which covers both. See 735 ILCS 5/2-209(a), (b) (West 2016). But the parties argue both forms of jurisdiction, and we

may affirm on any basis in the record. See *BankUnited, National Ass'n v. Giusti*, 2020 IL App (2d) 190522, ¶ 14. So we will consider both forms of personal jurisdiction.

¶ 28                                        I. General Jurisdiction

¶ 29     General jurisdiction allows a plaintiff to pursue *any* claim against a defendant, regardless of where the actionable conduct occurred, based on the defendant's relationship to the forum state. *Aspen*, 2017 IL 121281, ¶ 14 ("general jurisdiction is all-purpose. Where general jurisdiction exists, the plaintiff may pursue a claim against the defendant even if the conduct of the defendant that is being challenged occurred entirely outside the forum state.").

¶ 30     General jurisdiction exists when a nonresident corporation's " 'affiliations with the State are so continuous and systematic as to render' it 'essentially at home' in the State." *Id.* ¶ 19 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). This "essentially at home" analysis is far more exacting than a mere question of whether a company has a continuous and systematic presence within a state. *Aspen*, 2017 IL 121281, ¶ 16 (citing *Daimler AG v. Bauman*, 571 U.S. 117, 138-39 (2014)). As it should be; after all, "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *BNSF Railway Co. v. Tyrrell*, __ U.S. __, ___, 137 S. Ct. 1549, 1559 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.20 (2014)).

¶ 31     The quintessential examples of a corporation being "essentially at home" in a state is having its place of incorporation or principal place of business in that forum state. *Aspen*, 2017 IL 121281, ¶ 16; *Daimler*, 571 U.S. at 138. Outside of these two examples, general jurisdiction only exists in exceptional cases. *Aspen*, 2017 IL 121281, ¶ 17; *Daimler*, 571 U.S. at 139. As an example of an exceptional case, *Daimler* noted a case where a company was forced to relocate from the Philippines to Ohio due to World War II. *Daimler*, 571 U.S. at 139, n. 19 (citing

*Perkins v. Benguet Consolidated Mining Company*, 342 U.S. 437 (1952)). Ohio thus became "the center of the corporation's wartime activities" and, effectively, a "surrogate for the place of incorporation or head office." (Internal quotation marks omitted.) *Daimler*, 571 U.S. at 130 n.8.

¶ 32    Humilis is clearly unable to demonstrate general jurisdiction. First, it is now uncontested that, though Humilis alleged that WTS was a "domestic corporation" in its lawsuit and procured a default judgment with that allegation, in fact WTS's place of incorporation is Iowa, and its principal place of business is in West Des Moines, Iowa. This leaves only the high bar of establishing that this is an exceptional case. Humilis comes nowhere close to meeting that bar.

¶ 33    Humilis claims that general jurisdiction is proper because WTS's "contacts with Illinois were continuous and systematic, not just transitory." Humilis points to the fact that "[a]pproximately 9% of [WTS's] business is out of Illinois," and WTS owns property in the state. But as just noted, " 'even a company's "engagement in a substantial, continuous, and systematic course of business" alone is insufficient to render it at home in a forum.' " *Aspen*, 2017 IL 121281, ¶ 16 (quoting *Sonera Holding B.V. v. Çukurova Holding A.Ş.*, 750 F.3d 221, 226 (2d Cir. 2014), in turn quoting *Daimler*, 571 U.S. at 138).

¶ 34    WTS rightly relies on the Supreme Court's decision in *BNSF Railway*, 137 S. Ct. 1549. There, an injured railroad worker brought a FELA claim against BNSF in Montana, despite the fact that the injury did not occur there. *Id*. at 1553. The evidence showed that BNSF was incorporated in Delaware, with its principal place of business in Texas. *Id*. at 1554. In Montana, BNSF had "2,061 miles of railroad track [] (about 6% of its total track mileage of 32,500), employ[ed] some 2,100 workers there (less than 5% of its total work force of 43,000), generate[d] less than 10% of its total revenue in the State, and maintain[ed] only one of its 24 automotive facilities [] (4%)." *Id*.

¶ 35    The Montana Supreme Court found these contacts sufficient for general jurisdiction. *Id*. But the Supreme Court reversed. It found the Montana Supreme Court's distinction of *Daimler* unpersuasive and reiterated that, "[i]n short, the business BNSF does in Montana is sufficient to subject the railroad to specific personal jurisdiction in that State on claims related to the business it does in Montana. But in-state business, we clarified in *Daimler* and *Goodyear,* does not suffice to permit the assertion of general jurisdiction over claims like Nelson's and Tyrrell's that are unrelated to any activity occurring in Montana." *Id.* at 1558-59.

¶ 36    Again, the uncontested evidence here shows that WTS has 7% of its employees in Illinois and earns around 9% of its revenue here. Like WTS, we note a marked similarity in the amount of business it does in Illinois when compared to BNSF's in Montana—5% of employees and "less than 10% of its total revenue." *Id.* at 1554. And both WTS and BNSF only had one property within the forum state. Humilis does not even attempt to distinguish the Supreme Court's decision in *BNSF*. Instead, it relies solely upon the clearly rejected notion that general jurisdiction is appropriate because WTS has a consistent business presence in the state. See *Aspen*, 2017 IL 121281, ¶ 19-21 (rejecting notion that doing business in Illinois is sufficient for general jurisdiction).

¶ 37    As Illinois mirrors federal law on this issue, *BNSF* is directly on point and compels the conclusion that WTS's activities in Illinois are insufficient for general jurisdiction.

¶ 38                                    II. Specific Jurisdiction

¶ 39    This leaves specific jurisdiction, a " 'very different' " question from general jurisdiction. *Rios*, 2020 IL 125020, ¶ 20 (quoting *Brisol-Meyers Squibb Co. v. Superior Court of California,* __ U.S. __, __, 137 S. Ct. 1773, 1780 (2017)). For specific jurisdiction, the courts look to whether " 'the defendant has purposefully directed [its] activities at residents of the forum' and if

'the litigation results from alleged injuries that arise out of or relate to those activities.' " *Id.* (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985)).

¶ 40    That second clause is critical. It is not enough that a defendant has engaged in some acts within the forum state; those in-state activities must be ones that form the basis of the lawsuit at issue. See *Aspen*, 2017 IL 121281, ¶ 14 ("Specific jurisdiction is case-specific. That is, specific jurisdiction exists when the plaintiff's cause of action arises out of or relates to the defendant's contacts with the forum state."); *Russell*, 2013 IL 113909, ¶ 40 ("Under specific jurisdiction, a nonresident defendant may be subjected to a forum state's jurisdiction based on certain 'single or occasional acts' in the state but only with respect to matters related to those acts.") (quoting *Goodyear*, 564 U.S. at 923); 735 ILCS 5/2-209(a) (West 2016) (under long-arm statute, non-resident corporation may be subject to jurisdiction in Illinois for various acts committed within Illinois if the "cause of action aris[es] from the doing of" such acts within Illinois).

¶ 41    So while there is no question that WTS has directed some activities at Illinois residents—nearly 9% of its revenue and 7% of its employees—the operative question for specific jurisdiction is whether *the cause of action before us* resulted from activities that WTS directed at Illinois. " ' "At a minimum, the court must find an act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." ' " *Bolger v. Nautica International, Inc.*, 369 Ill. App. 3d 947, 952 (2007) (quoting *Campbell v. Mills,* 262 Ill. App. 3d 624, 627 (1994), in turn quoting *Sackett Enterprises, Inc. v. Staren,* 211 Ill. App. 3d 997, 1004 (1991)).

¶ 42    The only link to Illinois asserted by Humilis is the alleged oral promise that WTS made to Humilis's agent, who was in Chicago on the telephone, that WTS would leave the easement in good condition after the tree-cutting work was performed. To put a finer point on it, this is

precisely what Humilis's affiant, Steven Armbruster, an attorney with Vrdolyak Law Group, LLC, swore to in his affidavit:

"2. *** In my capacity as an attorney with the Vrdolyak Law Group, I had occasion to speak with a representative of Wright Tree Service, Inc., several times between January and August of 2016.

3. During these conversations, the Wright's representative made a series of promises concerning property owned by Humilis, LLC, an Illinois limited liability company co-managed by Peter T. Vrdolyak and Edward J. Vrdolyak.

4. Specifically, Wright's representative promised that Wright would return the property owned by Humilis to the condition it had been in before Wright had entered onto the property to cut down trees in the area.

5. During each of those conversations, I was in Illinois. I did not represent to Wright that I was anywhere else, and the phone number I used reflected an Illinois area code. Additionally, there were numerous times that I left voicemails indicating that I was calling from The Vrdolyak's office in Chicago.

6. Multiple phone conversations during that period were concerning the scheduling of a Wright representative coming to the property so the property manager could show him what was damaged."

¶ 43    Beyond that affidavit, we have only the three letters mentioned above that were submitted by Humilis at the June 2020 oral argument, which the court agreed would be made part of the record. One was sent well after the lawsuit began, merely enclosing a copy of the default judgment, and has little value here.

¶ 44 The October 5, 2016 letter from Mr. Ambruster to someone named "Mr. Dillon" would certainly appear to indicate that "Mr. Dillon" was someone representing or employed by WTS, but we cannot know that for certain; in any event, that letter encloses photographs of the damage to the easement that Humilis blamed on WTS. Of slightly more substance is the earlier August 3, 2016 letter from Mr. Armbruster to "Wright Tree Service" generally without a specific individual addressee. This letter notes that WTS recently "performed various services on property located" in Benton Harbor, and that WTS had "assured the property owners that the premises would be left in the same condition it was found" but "[i]t was not." In the letter, Mr. Armbruster writes: "I have had multiple conversations with Eric Davidson from [WTS] about this problem. Initially, he indicated that [WTS] would correct any problems, but then declined to do so."

¶ 45 That last letter, more than anything, corroborates Mr. Armbruster's affidavit, but it does not add any new facts to the question. In the end, the documentary evidence submitted by Humilis, read in the light most favorable to Humilis, indicates that Humilis had multiple conversations with someone from WTS—presumably Eric Davidson—during which Humilis secured a promise from WTS that it would leave the easement in good condition after the tree-cutting services were performed. For the reasons we explain below, we find that this evidence falls short of establishing specific personal jurisdiction over WTS in Illinois.

¶ 46 We should begin by reiterating that, when we discuss an alleged oral contract here between WTS and Humilis, we are not talking about a contract to perform the tree-cutting services. The tree-cutting agreement was between WTS and the holder of the easement in Michigan; at no time does Humilis ever suggest or even hint to the contrary. Rather, Humilis alleges only that, as the landowner of the property, it secured a "promise" from WTS to perform

that tree-cutting agreement in such as a way as to leave the easement in good condition. It is not clear, from the complaint and the Armbruster affidavit, precisely when these conversations occurred—before the work was performed or afterward or both. We know, from the August 3 letter from Armbruster to WTS, that the tree-cutting work had been completed by that date, because Armbruster says so. And thus we know, at a minimum, that the "promise" that Humilis deems actionable and enforceable occurred after the work was performed—according to count 2 of the complaint, "on or about August 21, 2016."

¶ 47    In any event, it is long settled that "[a]n individual's contract with a nonresident defendant alone does not automatically establish the requisite minimum contacts." *Id.*; see also *Cardenas*, 2012 IL App (1st) 111645, ¶ 36 ("A nonresident defendant's contract with an Illinois resident does not automatically establish sufficient minimum contacts to satisfy federal due process.").

¶ 48    Rather, in reviewing whether the alleged contract is sufficient, we take a holistic approach to the defendant's alleged contacts with Illinois. *Madison Miracle Productions, LLC v. MGM Distribution Co.*, 2012 IL App (1st) 112334, ¶ 54. There is no one-size-fits-all test here. *Id.* ¶ 62. But we traditionally consider such things as: "(1) who initiated the transaction; (2) where the contract was negotiated; (3) where the contract was formed; and (4) where performance of the contract was to take place." *Id.* ¶ 57. We may also consider the terms of the contract, the contemplated future consequences of the agreement, and the parties' actual course of dealing. *Id.* ¶ 62.

¶ 49    Regarding who initiated the communication, there is no indication that it was WTS that did so.  Mr. Armbruster's rather vague allegations, including the letters from him to WTS, do not say anything about who initiated the communications. Indeed, it would seem more likely that it

was Humilis who initiated these talks—it was Humilis, after all, not WTS, that would be concerned about the post-work condition of the easement. But we obviously cannot know for certain, and we will not speculate. All we can say with certainty is we have no information, one way or the other, on which party initiated these conversations. And it is also fair to say that it would have been a simple task for Humilis to provide that information, had it favored Humilis's position. So we cannot credit this factor in favor of Humilis in determining whether it has satisfied its *prima facie* case.

¶ 50    On appeal, Humilis concedes that the record below is silent as to who initiated the communications but claims that "[t]he burden is on WTS to show that [the communication] was initiated by Humilis." That is incorrect. Our review, as we have noted, is *de novo*, meaning we perform the same function as the trial court—and in doing so, we must consider whether Humilis carried its burden of making a *prima facie* case of personal jurisdiction. See *Aspen*, 2017 IL 121281, ¶ 12; *R.W. Sawant*, 111 Ill. 2d at 310. The silence of the record on this point most certainly does *not* favor Humilis.

¶ 51    The discussions in which WTS allegedly promised to leave the easement in good condition post-work took place, according to Mr. Armbruster, solely by telephone, between himself in Illinois and some unspecified individual from WTS in some unspecified location. (Again, the August 3 letter suggests the WTS representative was an Eric Davidson, but we have no information where Mr. Davidson is located.) Mr. Armbruster does not indicate the location or even the approximate location of the WTS individual with whom he spoke—the Iowa home office, somewhere in Michigan by the worksite—though Mr. Armbruster himself noted that this information can be easily discerned from the area code.

¶ 52　In any event, given modern forms of communication that allow individuals to easily cross state lines with a punch of a button or a click on a keyboard, we have been reluctant to place too much weight on the location of individuals when communications are other than in-person. See, *e.g.*, *Bolger*, 369 Ill. App. 3d at 954 ("although various pieces of communication were sent by both parties between Illinois and Florida, [defendant] did not reach into Illinois and purposefully avail itself of the benefits and protections of its laws."); *Wilson v. Liebel Holdings III, LLC*, 687 F. Supp. 2d 802, 808 (N.D. Ill. 2010) (Zagel, J.) (construing Illinois law) ("Defendant's email communications to [plaintiff] while in Illinois are insufficient to demonstrate that Defendants purposefully availed themselves to jurisdiction of Illinois courts").

¶ 53　Thus, none of these factors particularly favor Humilis. What strikes us as far more compelling, on the other hand, is that the entirety of the work was contemplated to be performed and was, in fact, performed exclusively in Michigan, often a decisive consideration. See, *e.g.*, *Swissland Packing Co. v. Cox*, 255 Ill. App. 3d 942, 944 (1994) (finding specific jurisdiction for breach of contract where, "[m]ost importantly, the defendant was to complete his performance under the contract in Illinois."); *Isringhausen*, 378 Ill. App. 3d at 1065, 1068 (contract made between non-Illinois resident and Illinois resident through "telephon[e], through fax, and through mail between Illinois and Florida" did not establish personal jurisdiction, as subject of contract occurred outside of Illinois; court distinguished other case law because in case before it, "all of the performance on the contract was to be in Florida.").

¶ 54　Here, the easement holder in Michigan contracted with WTS to perform work in Michigan. Even WTS's alleged promise to Humilis related to work to be performed exclusively in Michigan. If, as alleged, WTS negligently performed the work, its negligence occurred exclusively in Michigan. If, as alleged, WTS breached an oral promise to Humilis, it breached it

exclusively in Michigan. The state of Illinois bore almost no connection whatsoever to the events giving rise to the causes of action. WTS never had a physical presence in Illinois regarding this job; the contract contemplated full performance exclusively in Michigan; and in fact, the contract was entirely performed in Michigan.

¶ 55    These facts are particularly compelling given that, in the context of specific jurisdiction, we have long emphasized that "our 'focus is on the defendant's activities within the forum State, not on those of the plaintiff.' " *Madison*, 2012 IL App (1st) 112334, ¶ 70 (quoting *Sackett*, 211 Ill. App. 3d at 1004); *Estate of Isringhausen ex rel. Isringhausen v. Prime Contractors & Associates, Inc.*, 378 Ill. App. 3d 1059, 1063 (2008); *Bolger*, 369 Ill. App. 3d at 952. Humilis may have telephoned WTS from Illinois, but WTS did absolutely nothing to avail itself of the protections and benefits of Illinois. It contracted with a company in Michigan to perform work on an easement in Michigan. The landowner happened to reside in Illinois, thus necessitating communication into Illinois, but that is the beginning and end of Illinois's involvement in the affair.

¶ 56    We thus cannot agree that Humilis satisfied its *prima facie* case of demonstrating specific personal jurisdiction over Humilis. The circuit court erred in holding otherwise.

¶ 57                              CONCLUSION

¶ 58    The judgment of the circuit court is reversed. We remand this cause with instructions to grant the section 2-1401 petition, to vacate the default judgment, and to dismiss the underlying lawsuit with prejudice for lack of personal jurisdiction. All ancillary postjudgment proceedings to collect the judgment must be vacated as well.

¶ 59    Reversed and remanded with instructions.